CONSOLIDATED RAIL CORPORATION *v.* RAILWAY
LABOR EXECUTIVES' ASSOCIATION ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE THIRD CIRCUIT

No. 88–1.   Argued February 28, 1989—Decided June 19, 1989

*Dennis J. Morikawa* argued the cause for petitioner.
With him on the briefs were *Harry A. Rissetto, Michael J.*

*Ossip, Sarah A. Kelly, Bruce B. Wilson,* and *Jeffrey H. Burton.*

*John O'B. Clarke, Jr.,* argued the cause for respondents. With him on the brief were *Lawrence M. Mann, William G. Mahoney, Laurence Gold,* and *Cornelius C. O'Brien, Jr.**

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case, we must examine the concepts of "major" and "minor" disputes in the area of railway labor relations, articulate a standard for differentiating between the two, and apply that standard to a drug-testing dispute.

## I

Since its formation in 1976, petitioner Consolidated Rail Corporation (Conrail), has required its employees to undergo physical examinations periodically and upon return from leave. These examinations include the testing of urine for blood sugar and albumin and, in some circumstances, for drugs. On February 20, 1987, Conrail announced unilaterally that urinalysis drug screening would be included henceforth as part of *all* periodic and return-from-leave physical examinations. Respondent Railway Labor Executives' Association (the Union), an unincorporated association of chief executive officers of 19 labor organizations which collectively represent Conrail's employees, opposes this unilateral drug-testing addition.[1]

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Bolton, Deputy Solicitor General Merrill, Lawrence S. Robbins,* and *Leonard Schaitman;* and for the National Railway Labor Conference by *Richard T. Conway, Ralph J. Moore, Jr.,* and *David P. Lee.*

*Martin C. Seham* filed a brief for the Allied Pilots Association as *amicus curiae.*

[1] The Union filed suit against Conrail on May 1, 1986, well before Conrail unilaterally added drug testing to its physical examinations. See App. 3. The Union's complaint challenged Conrail's use of drug testing to enforce its disciplinary Rule G and to comply with federal drug-testing regulations affecting the railroad industry. By the time the District Court ruled, how-

The parties agree that Conrail's inclusion of drug testing in all physical examinations has created a labor dispute the resolution of which is governed by the Railway Labor Act (RLA), 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*[2] The question presented by this case is what *kind* of labor dispute we have before us: whether Conrail's addition of a drug screen to the urinalysis component of its required periodic and return-to-duty medical examinations gives rise to a "major" or a "minor" dispute under the RLA.

The United States District Court for the Eastern District of Pennsylvania agreed with Conrail that this case involves a minor dispute, because Conrail's policy of conducting physical examinations, which the parties agree is an implied term of their collective-bargaining agreement, arguably gave Conrail the discretion to include drug testing in all physical examinations. The Third Circuit reversed, ruling that "the undisputed terms of the implied agreement governing medical examinations cannot be plausibly interpreted to justify the new testing program." 845 F. 2d 1187, 1193 (1988). Although we find the question to be a close one, we agree with the District Court, and with those Courts of Appeals that have held, on similar facts, that disputes concerning the addition of a drug-testing component to routine physical examinations are minor disputes. See, *e. g.*, *Railway Labor Executives Assn.* v. *Norfolk & Western R. Co.*, 833 F. 2d 700, 705–706 (CA7 1987); *Brotherhood of Maintenance of Way Employees, Lodge 16* v. *Burlington Northern R. Co.*, 802 F. 2d 1016, 1024 (CA8 1986).

---

ever, the focus of the dispute had shifted to the addition of drug testing to routine physical examinations. That is the question framed by Conrail's petition for certiorari here.

[2] Cf. *Brotherhood of Locomotive Engineers* v. *Burlington Northern R. Co.*, 838 F. 2d 1087, 1089–1090 (CA9 1988) (employer took position that drug testing is not a mandatory subject of bargaining and thus that drug-testing disputes are not "labor disputes" subject to the dispute-resolution processes of the RLA), cert. pending, No. 87–1631.

## II

This Court has not articulated an explicit standard for differentiating between major and minor disputes. It adopted the major/minor terminology, drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA: major disputes seek to create contractual rights, minor disputes to enforce them. *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711, 723 (1945).

The statutory bases for the major dispute category are § 2 Seventh and § 6 of the RLA, 48 Stat. 1188, 1197, 45 U. S. C. § 152 Seventh and § 156. The former states that no carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in § 6. This statutory category

> "relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Burley*, 325 U. S., at 723.

In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation.[3] §§ 5 and 6. Until they have exhausted those procedures, the parties are obligated to maintain the status quo,

---

[3] In addition, the RLA provides for arbitration of a major dispute in the event that mediation fails. Thus, the National Mediation Board is required to "endeavor . . . to induce the parties to submit their controversey to arbitration." § 5 First. Participation, however, is voluntary. See Aaron, Voluntary Arbitration of Railroad and Airline Interest Disputes, in The Railway Labor Act at Fifty: Collective Bargaining in the Railroad and Airline Industries 129 (C. Rehmus ed. 1977).

and the employer may not implement the contested change in rates of pay, rules, or working conditions. The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury. See *Detroit & T. S. L. R. Co.* v. *Transportation Union*, 396 U. S. 142 (1969) (upholding status quo injunction without discussing equitable constraints); *Division No. 1, Detroit, Brotherhood of Locomotive Engineers* v. *Consolidated Rail Corp.*, 844 F. 2d 1218 (CA6 1988). Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force.

In contrast, the minor dispute category is predicated on § 2 Sixth and § 3 First (i) of the RLA, which set forth conference and compulsory arbitration procedures for a dispute arising or growing "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." This second category of disputes

> "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, *e. g.*, claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future." *Burley*, 325 U. S., at 723.

A minor dispute in the railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjustment Board, § 3, or before an adjustment board established by the employer and the unions representing the em-

ployees. §3 Second.[4] The Board (as we shall refer to any adjustment board under the RLA) has exclusive jurisdiction over minor disputes. Judicial review of the arbitral decision is limited. See §3 First (q); *Union Pacific R. Co.* v. *Sheehan*, 439 U. S. 89, 93 (1978). Courts may enjoin strikes arising out of minor disputes. *Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30 (1957). Although courts in some circumstances may condition the granting of a strike injunction on a requirement that the employer maintain the status quo pending Board resolution of the dispute, see *Locomotive Engineers* v. *Missouri-K.-T. R. Co.*, 363 U. S. 528, 534 (1960), this Court never has recognized a general statutory obligation on the part of an employer to maintain the status quo pending the Board's decision. Cf. *id.*, at 531, n. 3 (leaving open the question whether a federal court can require an employer to maintain the status quo during the pendency of a minor dispute at the union's independent behest, where no strike injunction has been sought by the employer).[5]

---

In the airline industry, also covered by the RLA, there is no national adjustment board; a minor dispute is resolved by an adjustment board established by the airline and the unions. 49 Stat. 1189, 45 U. S. C. § 184. See *Machinists* v. *Central Airlines, Inc.*, 372 U. S. 682 (1963). In both the airline and railroad industries, the National Mediation Board has a limited role to play in resolving a minor dispute: under § 5 Second, the Board may be called upon by a party to interpret "any agreement reached through mediation under the provisions of this Act." See also 49 Stat. 1189, 45 U. S. C. § 183 (applying § 5 to airlines).

[5] See generally Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum. L. Rev. 381, 386–397 (1960); cf. *Air Line Pilots Assn., Int'l* v. *Eastern Air Lines, Inc.*, 276 U. S. App. D. C. 199, 202, n. 2, 869 F. 2d 1518, 1520, n. 2 (1989); *International Assn. of Machinists and Aerospace Workers* v. *Northeast Airlines, Inc.*, 473 F. 2d 549, 555, n. 7 (CA1) (expressing the view that a "union [might] be able to enjoin changes in working conditions if it would be impossible otherwise later to make the workers whole"), cert. denied, 409 U. S. 845 (1972); *Division No. 1, Detroit, Brotherhood of Locomotive Engineers* v. *Consolidated Rail Corp.*, 844 F. 2d 1218, 1224, n. 10 (CA6 1988) (leaving open the question of injunction based on showing of irreparable harm). As the Union in the present case has not based its claim for injunctive relief on an allegation

Although experience in the rail industry suggested to Congress that the second category of disputes involved "comparatively minor" issues that seldom led to strikes, the Court recognized in *Burley* that this was not invariably the case. See 325 U. S., at 724; see also *Trainmen, supra*. Thus, the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help. See *National Railway Labor Conference* v. *International Assn. of Machinists and Aerospace Workers*, 830 F. 2d 741, 747, n. 5 (CA7 1987). Rather, the line drawn in *Burley* looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement. See Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L. J. 567, 568, 576 (1937).

To an extent, then, the distinction between major and minor disputes is a matter of pleading. The party who initiates a dispute takes the first step toward categorizing the dispute when it chooses whether to assert an existing contractual right to take or to resist the action in question. But

---

of irreparable injury, we decline to resolve the question whether a status quo injunction based on a claim of irreparable injury would be appropriate.

The Union suggests in passing that § 2 First provides a status quo obligation applicable to all minor disputes. See Brief for Respondents 21, 30–31. It relies on *Detroit & T. S. L. R. Co.* v. *Transportation Union*, 396 U. S. 142, 151 (1969), but, as we read that case, it does not support the Union's position. The language upon which the Union relies (a reference to "the implicit status quo requirement in the obligation imposed upon both parties by § 2 First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce") appears in the context of explaining that the express status quo requirements applicable to a *major* dispute must be broadly interpreted. It has no direct application to a minor dispute.

the Courts of Appeals early recognized that there is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a contractual basis for its claim is "insincere" in so doing, or its "position [is] founded upon . . . insubstantial grounds," the result of honoring that party's characterization would be to undercut "the prohibitions of § 2, Seventh, and § 6 of the Act" against unilateral imposition of new contractual terms. *Norfolk & Portsmouth Belt Line R. Co.* v. *Brotherhood of Railroad Trainmen, Lodge No. 514*, 248 F. 2d 34, 43–44, n. 4 (CA4 1957), cert. denied, 355 U. S. 914 (1958); see also *United Industrial Workers of Seafarers Int'l Union, AFL–CIO* v. *Board of Trustees of Galveston Wharves*, 351 F. 2d 183, 188–189 (CA5 1965). In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant.

To satisfy this need for some degree of judicial control, the Courts of Appeals uniformly have established some variant of the standard employed by the Third Circuit in this case:

> "'[I]f the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not "obviously insubstantial," the controversy is a [minor dispute] within the exclusive province of the National Railroad Adjustment Board.'" 845 F. 2d, at 1190, quoting *Local 1477 United Transportation Union* v. *Baker*, 482 F. 2d 228, 230 (CA6 1973).

Verbal formulations of this standard have differed over time and among the Circuits: phrases such as "not arguably justified," "obviously insubstantial," "spurious," and "frivolous" have been employed.[6] See, *e. g., Brotherhood of Locomo-*

---

[6] See, *e. g., National Railway Labor Conference* v. *International Assn. of Machinists and Aerospace Workers*, 830 F. 2d 741, 746 (CA7 1987) (not

*tive Engineers* v. *Burlington Northern R. Co.*, 838 F. 2d 1087, 1091 (CA9 1988) (reviewing different formulations used in the Ninth Circuit), cert. pending, No. 87–1631. "These locutions are essentially the same in their result. They illustrate the relatively light burden which the railroad must bear" in establishing exclusive arbitral jurisdiction under the RLA. *Brotherhood of Maintenance of Way Employees, Lodge 16* v. *Burlington Northern R. Co.*, 802 F. 2d, at 1022; see also *Maine Central R. Co.* v. *United Transportation Union*, 787 F. 2d 780, 783 (CA1) ("The degree of scrutiny, while ill-defined, is clearly light"), cert. denied, 479 U. S. 848 (1986).

"To the extent that abstract words can deal with concrete cases, we think that the concept embodied in the language adopted by these . . . Courts of Appeals is correct." *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 421 (1978). Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

## III

In this case, the Union appears to agree that the "arguably justified" standard generally is the appropriate one for distinguishing between major and minor disputes. Brief for Respondents 35, n. 29. But it argues that the dispute in this case, properly viewed, is neither a major dispute nor a minor dispute. According to the Union, where an employer has

---

frivolous or obviously insubstantial); *Maine Central R. Co.* v. *United Transportation Union*, 787 F. 2d 780, 782 (CA1) (even arguable), cert. denied, 479 U. S. 848 (1986); *International Brotherhood of Electrical Workers* v. *Washington Terminal Co.*, 154 U. S. App. D. C. 119, 136, 473 F. 2d 1156, 1173 (1972) (reasonably susceptible), cert. denied, 411 U. S. 906 (1973); *Ruby* v. *Taca International Airlines, S. A.*, 439 F. 2d 1359, 1363, n. 5 (CA5 1971) (wholly spurious).

made a clear "change [in] . . . working conditions . . . as embodied in agreements," but asserts that it has made the change "in the manner prescribed in such agreements," § 2 Seventh, because it has a contractual right to make the change, the ensuing dispute is a "hybrid case." Brief for Respondents 34–35, 40, n. 32.

In a hybrid dispute, the Union contends, the employer may ask the Board to determine whether it has the contractual right to make a particular change, but must forgo unilateral implementation of the change until the Board reaches its decision. If the employer makes the change without establishing a clear and patent right to do so, the employer violates its statutory duty not to "change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements *except in the manner prescribed in such agreements* or in section 6." § 2 Seventh (emphasis added). Stated more simply, the Union's position is that, while a dispute over the right to make the change would be a minor dispute, the actual making of the change transforms the controversy into a major dispute.

This approach unduly constrains the freedom of unions and employers to contract for discretion. Collective-bargaining agreements often incorporate express or implied terms that are designed to give management, or the union, a degree of freedom of action within a specified area of activity. See *NLRB* v. *American National Insurance Co.*, 343 U. S. 395 (1952); *Rutland Railway Corp.* v. *Brotherhood of Locomotive Engineers*, 307 F. 2d 21, 35–36 (CA2 1962), cert. denied, 372 U. S. 954 (1963). Cf. *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 580 (1960); see generally Cox & Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv. L. Rev. 389, 401 (1950). We have held under the National Labor Relations Act (NLRA) that no principle of labor law prohibits "[b]argaining for . . . flexible treatment" and requires instead that, for each working condition, the employer "agre[e] to freeze a

standard into a contract." *American National Insurance Co.*, 343 U. S., at 408. We find no difference between the NLRA and the RLA in this respect. Yet the Union would subject to especially strict scrutiny the bona fides of contractual claims arising out of contract terms that grant management the power to respond flexibly to changing circumstances. The effect of a selectively heightened level of scrutiny (a "clear and patent" rather than an "arguably justified" standard) would be to limit the enforceability of such contract terms, by requiring employers rigidly to maintain the status quo pending arbitration of their right to be flexible. That result is odd in itself, cf. *Rutland Railway Corp.*, 307 F. 2d, at 40 (requiring parties to negotiate over whether they have a duty to negotiate is "a solution sounding a lot like an exercise in theoretical logic"), and has unacceptable implications. To accept the bifurcated standard the Union advocates would, in effect, be impermissibly to "pass upon the desirability of the substantive terms of labor agreements," *American National Insurance Co.*, 343 U. S., at 408–409, by affording flexible terms a less favored status, cf. *International Assn. of Machinists and Aerospace Workers* v. *Northeast Airlines, Inc.*, 473 F. 2d 549, 555 (CA1), cert. denied, 409 U. S. 845 (1972).[7]

---

[7] Even if the Union's approach had merit in the abstract, it would be unworkable in practice. As discussed below, collective-bargaining agreements often contain implied, as well as express, terms. The Union conceded at oral argument that an employer would have the authority, without engaging in collective bargaining or statutory mediation, to open its locker room 15 minutes later than it had in the past without first establishing its contractual right to do so through a separate arbitration proceeding. Tr. of Oral Arg. 47–48, 50. That acknowledgment stemmed from the assumption that, although a change in opening time was indeed a "change," and although access to the locker room was a "working condition," the precise time the locker room opened was not an issue of sufficient significance to have become the subject of an implied contractual agreement, even if the existence of the locker room was itself an implied term of the contract. The Union recognizes, then, that the general framework of a collective-bargaining agreement leaves some play in the joints, permitting

Accordingly, we shall not aggravate the already difficult task of distinguishing between major disputes and minor disputes by adding a third category of hybrid disputes. We hold that if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (*i. e.*, the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

The effect of this ruling, of course, will be to delay collective bargaining in some cases until the arbitration process is exhausted. But we see no inconsistency between that result and the policies of the RLA.[8] The core duties imposed upon employers and employees by the RLA, as set forth in § 2 First, are to "make and maintain agreements" and to "settle all disputes . . . in order to avoid any interruption to commerce." Referring arbitrable matters to the Board will help to "maintain agreements," by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in "the common law of [the] particular industry."

---

management some range of flexibility in responding to changed conditions. The effect of adopting the Union's "hybrid dispute" proposal would be to require the trial court to make a nonexpert generalized judgment regarding the "importance" of a particular working condition, and to use that judgment as the basis for deciding whether a particular working condition is or is not within the parties' agreed range of discretion. We decline to put courts to that task.

[8] In most cases where the Board determines that the employer's conduct was not justified by the contract, the Board will be able to fashion an appropriate compensatory remedy which takes account of the delay. See, *e. g.*, *Order of Conductors* v. *Pitney*, 326 U. S. 561, 566 (1946); *In re Aaxico Airlines, Inc.*, 47 Lab. Arb. 289, 316 (1966); *In re Trans World Airlines, Inc.*, 34 Lab. Arb. 420, 425 (1959). There may be some circumstances, however, where the delay inherent in permitting the Board to consider the matter in the first instance will lead to remedial difficulties. See generally Comment, 60 Colum. L. Rev., at 394.

*Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S., at 579. Full utilization of the Board's procedures also will diminish the risk of interruptions in commerce. Failure of the "virtually endless" process of negotiation and mediation established by the RLA for major disputes, *Burlington Northern R. Co.* v. *Maintenance of Way Employes*, 481 U. S. 429, 444 (1987), frees the parties to employ a broad range of economic self-help, which may disturb transportation services throughout the industry and unsettle employer-employee relationships. See *TWA, Inc.* v. *Flight Attendants*, 489 U. S. 426 (1989). Delaying the onset of that process until the Board determines on the merits that the employer's interpretation of the agreement is incorrect will assure that the risks of self-help are not needlessly undertaken and will aid "[t]he peaceable settlement of labor controversies." *Virginian R. Co.* v. *Railway Employees*, 300 U. S. 515, 552 (1937).

## IV

This case, then, turns on whether the inclusion of drug testing in periodic and return-from-leave physical examinations is arguably justified by the parties' collective-bargaining agreement. Neither party relies on any express provision of the agreement; indeed, the agreement is not part of the record before us. As the parties acknowledge, however, collective-bargaining agreements may include implied, as well as express, terms. See, *e. g.*, *Northwest Airlines, Inc.* v. *Air Line Pilots Assn., Int'l*, 442 F. 2d 251, 253–254 (CA8), cert. denied, 404 U. S. 871 (1971). Furthermore, it is well established that the parties' "practice, usage and custom" is of significance in interpreting their agreement. See *Transportation Union* v. *Union Pacific R. Co.*, 385 U. S. 157, 161 (1966). This Court has observed: "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. '. . . [I]t is a generalized code to govern a myriad of cases

which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.'" *Id.*, at 160–161 (citation omitted) (quoting *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S., at 578–579).

In this case, Conrail's contractual claim rests solely upon implied contractual terms, as interpreted in light of past practice. Because we agree with Conrail that its contractual claim is neither frivolous nor obviously insubstantial, we conclude that this controversy is properly deemed a minor dispute within the exclusive jurisdiction of the Board.

### A

The essential facts regarding Conrail's past practices—the facts in support of the positions of both Conrail and the Union—are not disputed.[9] Since its founding in 1976, Conrail routinely has required its employees to undergo physical examinations under the supervision of its health services department. The parties agreed in the Court of Appeals, and the District Court found, that Conrail's authority to conduct physical examinations is an implied term of the collective-bargaining agreement, established by longstanding past practice and acquiesced in by the Union.

Conrail conducts physical examinations in three categories of cases. First, it always has required its employees to un-

---

[9] This is not to say that the legal significance of these practices is undisputed. In particular, the parties take different views of how a court is to determine whether a particular past practice has risen to the level of an implied contractual term. Compare Brief for Respondents 42–43 with Brief for Petitioner 19. The precise definition of this standard, however, is of no particular significance to this case. As will become clear, the parties have agreed that Conrail's power to conduct physical examinations is an implied contractual term. The District Court made no factual findings that Conrail's specific practices had themselves become implied terms of the contract, and we do not suggest otherwise in the discussion that follows.

dergo *periodic* physical examinations, which have routinely included a urinalysis for blood sugar and albumin. These periodic examinations are conducted every three years for employees up to the age of 50, and every two years thereafter. Second, Conrail has required train and engine employees who have been out of service for at least 30 days due to furlough, leave, suspension, or other similar cause to undergo *return-to-duty* physical examinations. These also routinely include urinalysis. Conrail employees in other job classifications are required to undergo return-to-duty physical examinations that include urinalysis for blood sugar and albumin, but are required to submit to examinations only after absences of 90 days or more. Third, when justified by the employee's condition, Conrail has routinely required a *follow-up* physical examination. For example, such an examination has been required for an employee who has suffered a heart attack, or has been diagnosed as having hypertension or epilepsy. Any employee who undergoes a periodic, return-to-duty, or follow-up physical examination and who fails to meet Conrail's established medical standards may be held out of service without pay until the condition is corrected or eliminated.

Conrail has implemented medical standards for all three types of physical examination. Over the years, procedures for hearing tests, lung-capacity tests, eye tests, and cardiological tests have been modified to reflect changes in medical science and technology. These changes have been made by Conrail unilaterally, without consulting the Union.

Drug testing always has had some place in Conrail's physical examinations, although its role has changed with time. Conrail has included drug testing by urinalysis as part of periodic physical examinations whenever, in the judgment of the examining physician, the employee may have been using drugs. Drug screens also routinely have been performed as part of the return-to-duty physical examination of any employee who has been taken out of service previously for a drug-related problem; in addition, drug testing is included

whenever the examining physician thinks the employee may have been using drugs.

On April 1, 1984, Conrail issued a Medical Standards Manual stating that a drug screen would be included in all periodic and return-to-duty physicals. For budgetary reasons, however, this policy then was applied only in Conrail's eastern region and was discontinued after six months.

On February 20, 1987, Conrail implemented the Medical Standards Manual in all of its regions, requiring drug testing as part of its periodic and return-to-duty physicals and, in addition, requiring follow-up examinations for all employees returning to duty after disqualification for any reason associated with drug use.[10] An employee who tests positive for drugs will not be returned to service unless he provides a negative drug test within 45 days of the date he receives notice of the positive test. An employee whose first test is positive may go to Conrail's Employee Counseling Service for evaluation. If the evaluation reveals an addiction problem, and the employee agrees to enter an approved treatment program, the employee will be given an extended period of 125 days to provide a negative test.

The problem of drug use has been addressed by Conrail not only as a medical concern, but also as a disciplinary one. This Court noted earlier in the present Term that the railroad industry has adopted operating "Rule G," which governs drug use by employees. *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 606–607 (1989). As currently implemented by Conrail, Rule G provides: "The use of intoxicants, narcotics, amphetamines or hallucinogens by employees subject to duty, or their possession or use while on duty, is prohibited. Employees under medication before or while on duty must be certain that such use will not affect the safe

---

[10] The Union suggests that Conrail's decision to implement its current drug-testing program resulted from a serious Conrail accident in January 1987, in which the engineer and conductor of the train admitted smoking marijuana in the cab just prior to the collision. Brief for Respondents 6.

performance of their duties." See App. 63. At Conrail, as elsewhere in the industry, an employee may be dismissed for violating Rule G. *Skinner*, 489 U. S., at 607; Tr. of Oral Arg. 43. Conrail has relied chiefly on supervisory observation to enforce Rule G. An employee suspected of drug or alcohol use is encouraged voluntarily to agree to undergo diagnostic tests, but is not required to do so.

In addition, Conrail has implemented the Federal Railroad Administration regulations recently upheld in *Skinner* against a Fourth Amendment challenge. Since March 1986, Conrail has required all employees covered by the Hours of Service Act, 45 U. S. C. § 61 *et seq.*, to undergo postaccident drug and alcohol testing, pursuant to 49 CFR § 219 *et seq.* (1987).[11]

## B

The dispute between the parties focuses on the meaning of these past practices. Conrail argues that adding urinalysis drug testing to its periodic and return-to-duty physicals is justified by the parties' implied agreement regarding physical examinations, as indicated by their longstanding practice of permitting Conrail unilaterally to establish and change fitness-for-duty standards, to revise testing procedures, and to remove from service employees who are deemed unfit for duty under those standards and testing procedures.[12] Conrail contends, specifically, that past practice reflects that drug use has been deemed relevant to job fitness, and that Conrail's physicians have the discretion to utilize drug testing as part of their medical determination of job fitness. The expansion of drug testing in February 1987, Conrail argues,

---

[11] It was the implementation of the Federal Railroad Administration regulations that precipitated the instant lawsuit, Brief for Respondents 7, but no issue regarding Conrail's implementation of those regulations is presently before us.

[12] Conrail argued in the District Court that the parties' implied agreement regarding Rule G enforcement justified its current drug-testing practice, but abandoned that position on appeal. See 845 F. 2d, at 1194.

represents no more than a diagnostic improvement in its medical procedures, similar to diagnostic improvements Conrail unilaterally made in the past.[13]

The Union contends that, even using the "arguably justified" standard, "it is simply not plausible" to conclude that the parties' agreement contemplated that Conrail had the authority to include drug screens in all routine physical examinations. The Union argues that Conrail has departed materially from the parties' agreement, as reflected by Conrail's past medical practice, in several respects. First, the Union states that past practice limited the use of drug testing in physical examinations to circumstances in which there was cause to believe the employee was using drugs; the current program, on the other hand, includes testing without cause. Second, in the Union's view, Conrail's general medical policy permits Conrail to remove an employee from active service until the employee's physical condition improves, but does not permit Conrail to discharge an employee for failure to get well within a specified time; the current drug-testing program includes a fixed time limit, and results in discharge rather than removal from active service. Third, the Union contends that the expansion of drug testing constitutes, for the first time, regulation by Conrail of the private, off-duty conduct of its employees.

In addition to pointing to these asserted departures from past practice, the Union argues that the absence of a "meeting of the minds" on the particulars of testing and confidentiality procedures renders untenable Conrail's claim that the parties tacitly have agreed to Conrail's current use of drug testing. Finally, the Union presents an alternative view of what Conrail has done: Conrail has expanded the *disciplinary* use of drug testing to employees not covered by the Federal Railroad Administration regulations, an expansion

---

[13] We note that Conrail does not seek to rely on the 1984 limited implementation of routine drug testing as evidence of a past practice acquiesced in by the Union. See *id.*, at 1193, n. 3.

which impermissibly adds drug testing to the list of available means for the enforcement of Rule G.

## C

In the end, the Union's arguments distinguishing drug testing from other aspects of Conrail's medical program, and asserting that Conrail's true motive is disciplinary, conceivably could carry the day in arbitration. But they do not convince us that Conrail's contractual arguments are frivolous or insubstantial. Conrail's interpretation of the range of its discretion as extending to drug testing is supported by the general breadth of its freedom of action in the past, and by its practice of including drug testing within routine medical examinations in some circumstances.

In the past, the parties have left the establishment and enforcement of medical standards in Conrail's hands. Conrail long has treated drug use as a matter of medical concern. Cf. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 163–179 (3d ed. 1980) (substance abuse disorders); BNA Special Report, Alcohol & Drugs in the Workplace: Costs, Controls, and Controversies 1 (1986) (disciplinary and therapeutic approaches to drugs in the workplace); T. Denenberg & R. Denenberg, Alcohol & Drugs: Issues in the Workplace 18 (1983) (drug and alcohol abuse as treatable disorders); cf. *Traynor* v. *Turnage*, 485 U. S. 535, 562–564 (1988) (opinion concurring in part and dissenting in part) (alcohol dependence as medical problem). Indeed, although the scope of drug testing within physical examinations has changed over time, drug testing has always played some part (in appropriate circumstances) in Conrail's medical examinations. In short, there is no established "rule" between the parties that drug use is solely a disciplinary, and never a medical, concern.

There need be no "meeting of the minds" between the parties on the details of drug-testing methods or confidentiality standards for Conrail's current drug-testing program argu-

ably to be justified by the parties' agreement. As we have noted, labor laws do not require all the details of particular practices to be worked out in advance. Conrail's claim that drug testing is an area in which Conrail retains a degree of discretion finds some support in the fact that the Union never before has intervened in the procedural details of Conrail's drug testing: such testing has been performed—like other medical tests—according to standards unilaterally promulgated by Conrail. Thus, the absence of a specific agreement between the parties regarding testing procedures and confidentiality does not sufficiently undermine Conrail's contractual claim to require that this dispute be classified as "major."

Conrail's well-established recognition of the relevance of drug use to medical fitness substantially weakens the Union's claim that Conrail now, for the first time, is engaging in medical testing that reveals facts about employees' private off-duty conduct. Indeed, the fact that medical testing often detects physical problems linked to off-duty behavior makes it difficult to draw a bright line for jurisdictional purposes between testing which does, and that which does not, reflect upon private conduct.

As to the relevance of "cause," we do not doubt that there is a difference between Conrail's past regime of limiting drug testing to circumstances in which there is cause to believe that the employee has used drugs and Conrail's present policy of including drug tests in all routine physical examinations. Indeed, the difference between testing with and without cause perhaps could be of significance to arbitrators in deciding the merits of drug-testing disputes. See generally Denenberg & Denenberg, Drug Testing from the Arbitrator's Perspective, 11 Nova L. Rev. 371, 387–392 (1987); Veglahn, What is a Reasonable Drug Testing Program?: Insight from Arbitration Decisions, 39 Lab. L. J. 688, 689–692 (1988). But under the RLA, it is not the role of the courts to decide the merits of the parties' dispute. Our role is limited

to determining where the "arguably justified" line is to be drawn. For the limited purpose of determining whether Conrail's claim of contractual right to change its medical testing procedures must be rejected as obviously insubstantial, that line cannot reasonably be drawn between testing for cause and testing without cause.

As Conrail pointed out and urged at oral argument, "particularized suspicion" is not an accepted prerequisite for medical testing. Tr. of Oral Arg. 21. A physician's decision to perform certain diagnostic tests is likely to turn not on the legal concept of "cause" or "individualized suspicion," but rather on factors such as the expected incidence of the medical condition in the relevant population, the cost, accuracy, and inherent medical risk of the test, and the likely benefits of detection. In designing diagnostic-testing programs, some employers establish a set of basic tests that are to be administered to *all* employees, see generally M. Rothstein, Medical Screening of Workers 16–19 (1984), regardless of whether there is cause to believe a particular employee will test positive. It is arguably within Conrail's range of discretion to alter its position on drug testing based on perceived changes in these variables.

We turn next to the alleged disciplinary consequences of a positive drug test. It is clear that Conrail is not claiming a right, under its medical policy, to discharge an employee because of a single positive drug test, a right many railroads assert under Rule G. See *Skinner*, 489 U. S., at 607. Furthermore, an employee has the option of requesting a period of rehabilitative treatment. Thus, it is surely at least arguable that Conrail's use of drug testing in physical examinations has a medical, rather than a disciplinary, goal.

The fact that for drug problems, unlike other medical conditions, Conrail's standards include a fixed time period in which the employee's condition must improve does serve to distinguish Conrail's drug policy from its response to other medical problems. Conrail has argued that it needs, for

medical purposes, to require employees who deny that they are drug dependent to demonstrate that they are capable of producing a drug-free sample at will. Tr. of Oral Arg. 13. In our view, that argument has sufficient merit to satisfy Conrail's burden of demonstrating that its claim of contractual entitlement to set a time limit for successful recovery from drug problems is not frivolous.

## V

Because we conclude that Conrail's contractual arguments are not obviously insubstantial, we hold that the case before us constitutes a minor dispute that is within the exclusive jurisdiction of the Board. We make clear, however, that we go no further than to hold that Conrail has met the light burden of persuading this Court that its drug-testing practice is arguably justified by the implied terms of its collective-bargaining agreement. We do not seek to minimize any force in the Union's arguments that the discretion afforded Conrail by the parties' implied agreement, as interpreted in light of past practice, cannot be understood to extend this far. Thus, in no way do we suggest that Conrail is or is not entitled to prevail before the Board on the merits of the dispute.

The judgment is reversed.

*It is so ordered.*

JUSTICE WHITE, concurring.

I join the opinion and judgment of the Court. I add these remarks only to emphasize that the parties agree and the courts below held that giving physical examinations is a matter covered by an implied agreement between Conrail and the Union. The company claims that although instituting drug testing is a change in conditions, the implied contract authorizes the change. I agree that this claim has substance and that the dispute is a minor one for the Adjustment Board to resolve. If the Board decides that the company is wrong about its authority under the contract, the

result will be that the company has sought a change in the contract without invoking the procedures applicable to major disputes.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

I would affirm the judgment of the Court of Appeals for the reasons stated by that court. The routine medical examinations Conrail relies on as precedent for its drug-testing program could result, at most, in an employee being held out of service until his or her health improved. Conrail would have us believe that, in accepting such medical testing, the Union (arguably) agreed to testing for use of an illegal substance that could result in the employee's firing. It is unsurprising that the Union agreed to nonpunitive medical testing, and that it acquiesced in the employer making such unilateral changes in testing procedures as it determined were advisable on the basis of current medical technology. But it is inconceivable to me that in so doing the Union was also agreeing to the systematic, suspicionless testing, on such terms and in such manner as the employer alone prescribed, of all employees for evidence of criminal activity that, under the employer's plan, could result in discharge.* Such a contention, in my view, is not "arguable"—it is frivolous. I agree with the Court of Appeals that "[u]ltimately, Conrail's argument rests on the premise that testing urine for cannabis metabolites is no different in kind from testing urine for blood sugar. This

---

*The Court rests its holding that the purpose of Conrail's drug tests is—arguably—medical rather than disciplinary solely on the ground that Conrail will not discharge an employee on the basis of one positive drug test standing alone and that it will permit the employee "a period of rehabilitative treatment" prior to a second test. *Ante,* at 319. I do not agree that these factors even arguably bring Conrail's drug-testing program within the realm of the existing medical examinations. Beyond this, however, I note that under the Court's reasoning the outcome of the case should be different if the employer's policy were indeed "to discharge an employee because of a single positive drug test." *Ibid.*

ignores considerable differences in what is tested for and the consequences thereof." 845 F. 2d 1187, 1194 (CA3 1988).

It may be helpful to note what the general counsel of the National Labor Relations Board had to say in addressing the somewhat similar question whether, under the National Labor Relations Act, the addition of drug testing to a previously required physical examination constitutes a "substantial change in working conditions":

> "In cases where an employer has an existing program of mandatory physical examinations for employees or applicants, an issue arises as to whether the addition of drug testing constitutes a substantial change in the employees' terms and conditions of employment. In general, we conclude that it does constitute such a change. When conjoined with discipline, up to and including discharge, for refusing to submit to the test or for testing positive, the addition of a drug test substantially changes the nature and fundamental purpose of the existing physical examination. Generally, a physical examination is designed to test physical fitness to perform the work. A drug test is designed to determine whether an employee or applicant *uses* drugs, irrespective of whether such usage interferes with ability to perform work." NLRB General Counsel's Memorandum on Drug and Alcohol Testing, Memorandum GC 87–5 (Sept. 8, 1987), reprinted in BNA Daily Labor Report, No. 184, pp. D–1, D–2 (Sept. 24, 1987) (emphasis in original).

The general counsel similarly concluded that "a union's acquiescence in a past practice of requiring applicants and/or current employees to submit to physical examinations that did not include drug testing . . . does not constitute a waiver of the union's right to bargain over drug testing." *Ibid.*

Without suggesting that the NLRA question of a "substantial change in working conditions" is precisely the same as the one before us, I do think the general counsel has a better un-

derstanding than does the Court of the relationship between drug testing and routine physical examinations. I respectfully dissent.