**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Plaintiffs,**

v.

**THE M & B RAILROAD, L.L.C., et al., Defendants.**

No. 97–T–1683–S.

United States District Court, M.D. Alabama, Southern Division.

Sept. 13, 1999.

Jeffrey A. Bartos, Joseph Guerrieri, Jr., Marissa A. Jacobson, Elise B. Steinberg, Guerrieri, Edmond & Clayman, PC, Washington, DC, Clarence M. Small, Jr., Rives & Peterson, Birmingham, AL, for plaintiffs.

Dow T. Huskey, Jr., Dothan, AL, Ronald M. Johnson, Wendy E. Sheldon, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

In this lawsuit, the plaintiff (a national union) is petitioning the court to compel the defendants (two railroads) to arbitrate a dispute over certain labor-protective provisions in a collective bargaining agreement. The plaintiff is the International Association of Machinists and Aerospace Workers, AFL–CIO (commonly referred to as the IAM); the defendants are Meridian & Bigbee Railroad Company and M & B Railroad, L.L.C.[1] The IAM bases this lawsuit on the Railway Labor Act, as amended, 45 U.S.C.A. §§ 151–188 (commonly referred to as the RLA). The union has properly invoked the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331 and 1337. Based on the briefs and the joint evidentiary record submitted by the parties, the court holds that the IAM's petition to arbitrate should be denied, albeit without prejudice.[2]

## II. BACKGROUND

In October 1993, the IAM entered into a collective bargaining agreement with Meridian & Bigbee. The agreement contains two labor-protective provisions covering situations in which Meridian & Bigbee might sell or otherwise dispose of any segment of its railroad. Rule 38, the 'successor clause,' provides that Meridian & Bigbee cannot consummate a sale or disposition without agreeing to provide for the seniority rights of the IAM's members and obtaining certain commitments from the acquirer.[3] Rule 39, the 'protection-of-employees clause,' requires that, before the consummation of a sale covered in the successor clause, Meridian & Bigbee and the acquirer must negotiate with the IAM for labor "protective benefits no less than *New York Dock*," and, if an impasse occurs in the negotiations, the parties must arbitrate the contested issues "pursuant to *New York Dock*." [4]

---

1. One of IAM's district lodges, District Lodge 19, has joined IAM as a plaintiff. However, for ease of discussion, the court refers to only IAM throughout this opinion.

2. The parties agreed to the submission of this case on briefs and a jointly prepared evidentiary record. *See* order entered August 26, 1998.

3. Rule 38 states in part:

 "The Carrier shall not sell or in any manner dispose of all or any segment of its railroad, including shop facilities, without first entering into an Agreement with the International Association of Machinists and Aerospace Workers to provide for a fair and equitable treatment of seniority on other seniority rosters of employees whose seniority rights are affected by this sale and without first obtaining binding commitments from the acquirer to:

 (a) Recognize the International Association of Machinists and Aerospace Workers as the representative of the employees pursuant to the Railway Labor Act, as amended.

 (b) Assume all collective bargaining Agreements with and obligations to, the Carrier's employees represented by the International Association of Machinists and Aerospace Workers.

 (c) Hire the Carrier's employees represented by the International Association of Machinists and Aerospace Workers in seniority order without physicals."

4. Rule 39 states in part:

 "Prior to the consummation of a transaction covered in the "Successor Clause", the Carrier and the acquirer shall negotiate with ... [IAM] protection for the employees of the selling railroad and acquirer providing protective benefits no less than *New York Dock*. If impasse occurs, the issues shall be subject to arbitration pursuant to *New York Dock*. There will be no changes in the Carrier's operations, services, facilities or employees status prior to consummation of Agreement pursuant to this Rule 39."

In 1997, the two railroads, Meridian & Bigbee and M & B, became one.[5] The IAM, on behalf of six union members, responded with the contention that the transaction had triggered Rules 38 and 39. The railroads took the position that the two rules do not apply because Meridian & Bigbee had neither sold nor disposed of its assets and thus Meridian & Bigbee's employees were left unaffected. The railroads maintained that Rules 38 and 39 addressed circumstances where a railroad was acquired by another railroad and its workforce was merged with that of the acquiring railroad. Here, according to the railroads, there was no merger of workforces because M & B was not even a railroad until it acquired Meridian & Bigbee's rail lines.

The IAM requested expedited arbitration of the matter, and, after no response, commenced this lawsuit under the RLA to compel arbitration.

## II. DISCUSSION

The RLA was enacted, in part, "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C.A. § 151a. Such disputes are termed 'minor disputes.' *See Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Intern.*, 861 F.2d 1546, 1554 (11th Cir.1988). Here, the IAM and the railroads agree that their dispute is a minor one.

 In *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989), the Supreme Court "articulated an explicit standard for differentiating between major and minor disputes." The Court referred to the disputes "as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA: *major disputes* seek to create

contractual rights, *minor disputes* to enforce them." *Id.* at 302, 109 S.Ct. at 2480 (emphasis added).

A major dispute relates to disputes over the formation of, or efforts to secure, collective agreements. They arise where there is no agreement or where it is sought to change the terms of one; thus, the issue is not whether an existing agreement controls the controversy. Major disputes look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past. *See id.; Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886 (1945).

A minor dispute, in contrast, contemplates the existence of a collective agreement already concluded "or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." *Consolidated Rail Corp.*, 491 U.S. at 303, 109 S.Ct. at 2480–2481 (quoting *Burley*, 325 U.S. at 723, 65 S.Ct. at 1289–1290). The dispute, which is often called a grievance, "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* "[T]he claim is to rights accrued, not merely to have new ones created for the future." *Id.*

Major and minor disputes also differ in the procedures Congress has fashioned for their resolution. In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. *See* 45 U.S.C.A. §§ 155 and 156. "Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force," *Consolidated Rail Corp.*, 491 U.S. at 302, 109 S.Ct. at 2480 (citations omitted), including strikes by the union.

In contrast, a minor dispute in the railroad industry is subject to compulsory and

---

**5.** The union and the railroads strongly disagree about the nature of the transaction that resulted in combining Meridian & Bigbee with M & B. The words chosen by this court to describe this transaction should not be taken to indicate that the court has sided with either side.

binding arbitration before the National Railroad Adjustment Board, *see* 45 U.S.C.A. § 153, First, or before an adjustment board established by the employer and the unions representing the employees. *See id.,* Second. The latter is commonly termed a 'public law board.' The decision of the adjustment board (either the National Railroad Adjustment Board or a public law board) is subject to limited review in district courts, *see id.,* First (q) (District court vested with power to set aside order of National Railroad Adjustment Board "for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order. The judgment of the court shall be subject to review as provided in sections 1291 and 1254 of Title 28.") and Second (Orders of public law boards are "enforc[ea]ble by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the [National Railroad] Adjustment Board."). *See also Union Pacific R. Co. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978); *Gunther v. San Diego & A.E. Ry. Co.,* 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965).

The primary issue the parties present here is whether this court possesses jurisdiction to compel the railroads to arbitrate the parties' minor dispute under Rule 39 of the collective bargaining agreement. The parties stand ready and willing to arbitrate the issue of whether the transaction involving the railroads is *covered* by Rules 38 and 39. The IAM, however, wants the railroads to go one step further and agree that, *if* the adjustment board finds that the transaction is covered by Rules 38 and 39, then the board is further empowered to arbitrate the fashioning of a new labor-protective agreement under Rule 39.

The railroads respond with a number of arguments as to why this court should not compel arbitration of a new labor-protective agreement, but their principal arguments are as follows: First, Rule 39 expressly states that the parties must "negotiate" the new labor-protective agreement before they can turn to arbitration. Thus, should the adjustment board conclude that Rules 38 and 39 apply to the transaction, the parties would then be required to engage in good-faith negotiation about a new labor-protective agreement before either could resort to arbitration as a remedy.

Second, the arbitration envisioned by Rule 39 is under the so-called *New York Dock* procedures, and not under the RLA procedures which the parties agree govern the resolution of the coverage issue. As stated, Rule 39 requires that, before the consummation of a sale covered in Rule 38, Meridian & Bigbee and the acquirer must negotiate with the IAM for labor "protective benefits no less than *New York Dock,*" and, if an impasse occurs in the negotiations, the parties must arbitrate the contested issues "pursuant to *New York Dock.*"

"*New York Dock*" refers to the labor-protective conditions imposed by the Surface Transportation Board (commonly referred to as the STD) in railroad consolidations pursuant to Chapter 113 of the Interstate Commerce Act, recodified in 1995 at 49 U.S.C.A. §§ 11301 to 11328.[6] *See New York Dock Railway–Control–Brooklyn Eastern Dist. Terminal,* 360 I.C.C. 60, 78, 88 (1979), *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979).

Section 2 of the *New York Dock* conditions provides that the "rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits ... under applicable laws and/or existing collective bargaining agreements ... shall be preserved unless changed by future collective bargaining agreements."

---

**6.** The ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, abolished the Interstate Commerce Commission and established the STD in its stead.

360 I.C.C. at 84. Section 4 sets forth negotiation and arbitration procedures for resolution of labor disputes arising from an approved railroad merger. *Id.* at 85. Section 4 provides that a merged or consolidated railroad that plans an operational change that may cause dismissal or displacement of any employee must give the employee and his union 90 days' written notice, *id.*, and, if the railroad and union cannot agree on terms and conditions within 30 days, each party may submit the dispute for an expedited "final, binding and conclusive" determination by a neutral arbitrator. *Id.* Finally, §§ 5–9 and 12 of the *New York Dock* conditions provide affected employees with up to six years of income protection, as well as reimbursements for moving costs and losses from the sale of a home. *See id.* at 86–89.

While the arbitration under the *New York Dock* procedures is a " 'final, binding and conclusive' determination by a neutral arbitrator," *Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 121, 111 S.Ct. 1156, 1159, 113 L.Ed.2d 95 (1991) (quoting 360 I.C.C. at 85), it is subject to review by the STD. *See* 49 C.F.R. § 1115.8. Moreover, "[i]f, in the exercise of its duties, the STD exceeds the scope of its authority in approving a transaction subject to its jurisdiction, a party may seek review of the STD's decision in a court of appeals under the provisions of 28 U.S.C. § 2342(5) (vesting the courts of appeals with exclusive jurisdiction to review all 'final orders of the [Surface] Transportation Board made reviewable by section 2321 of this title') and 28 U.S.C. § 2321 (providing for judicial review of the STD's orders and decisions)." *Norfolk and Western Ry. Co. v. Brotherhood of R.R. Signalmen,* 164 F.3d 847, 855 (4th Cir.1998). According to the District of Columbia Circuit Court of Appeals, "Dispute resolution procedures under the RLA are less expeditious than those under *New York Dock.*" *United Transp. Union v. Surface Transp. Bd.,* 114 F.3d 1242, 1244 n. 4 (1997).

Therefore, according to the railroads here, Rule 39 (or *New York Dock*) arbitration is completely different from RLA ad-justment-board arbitration. The RLA procedures, which would govern the determination of whether Rules 38 and 39 apply, would not govern the actual application of Rule 39; rather the *New York Dock* procedures would govern the actual application. In others words, if the RLA adjustment board determines that Rules 38 and 39 apply, the parties would have to invoke the *New York Dock* procedures in applying Rule 39, that is, in fashioning a new labor-protective agreement. The IAM is incorrectly asking the court to compel RLA arbitration to a dispute that requires *New York Dock* procedures.

■ Third, the fashioning of a new labor-protective agreement would constitute 'interest arbitration,' which would be outside the competence of a public law board. " 'Interest arbitration' in labor matters involves the submission of disputes over terms for a new collective bargaining agreement [or the like] to an independent third party who determines what the new terms of the contract will be. Interest arbitration should be distinguished from 'grievance arbitration,' which involves the submission of disputed interpretations of an existing collective bargaining agreement to an independent third party who determines what construction the existing term should be given." *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Ass'n,* 853 F.2d 506, 509 n. 6 (7th Cir.1988). *See also N.L.R.B. v. Columbus Printing Pressmen and Assistants' Union No. 252,* 543 F.2d 1161, 1163 (5th Cir.1976). Disputes submitted for interest arbitration appear to be more akin to major, rather than minor, disputes. The railroads maintain that RLA adjustment boards have authority to arbitrate only minor disputes, that is, to interpret and enforce contractual rights, not to create them, which is what the boards would have to do in interest arbitration.

Fourth and finally, even if the IAM were correct—that is, that the railroads should up-front agree to arbitration of a new labor-protective agreement before a public law board—the union would still have no

reason to turn to this court for an order compelling arbitration. The RLA, according to the railroads, provides two alternative extra-judicial means to compel a recalcitrant party to engage in arbitration. The union can unilaterally pursue compulsory arbitration before the National Railroad Adjustment Board. "The right of one party to place the disputed issue before the Adjustment Board, with or without the consent of the other, has been firmly established." *Brotherhood of Locomotive Engineers v. Louisville & N.R. Co.,* 373 U.S. 33, 38, 83 S.Ct. 1059, 1062 (1963). Alternatively, the union can unilaterally pursue the establishment of a public law board. If the railroads fail to agree upon the establishment of a public law board, then the union can "request the Mediation Board to designate a member of the special board on behalf of the [railroads]." 45 U.S.C.A. § 153, Second, and, once established, the public law board could "determine all matters not previously agreed upon by the [railroads] and the [union] with respect to the establishment and jurisdiction of the board." *Id. See also Chicago & North Western Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 148 (7th Cir.1990) ("Not only would no purpose be served by ordering arbitration, but there is a considerable question, though again one not necessary to decide, concerning the district court's power to order arbitration. The Act does not confer such a power, and we are unclear what purpose would be served by interpolating one. Either party to a collective bargaining agreement can invoke the arbitral process, 45 U.S.C. § 153 First (i), which will then proceed to an award enforceable in district court under sections First (p) or (q), whether or not the other party cooperates; there can be a default in arbitration just as there can be a default in adjudication. There is no need for a party to run to the court first for an order to arbitrate,

and we are given no explanation for why the railroad followed that procedure here."), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

■ Fortunately, this court need not reach the difficult issues presented in the railroads' arguments. Here the union agrees that the need to fashion a new labor-protective agreement will arise *only if* the adjustment board (either the National Railroad Adjustment Board or a public law board) concludes that the transaction resulting in the combining of the two railroads triggered Rules 38 and 39. The court, however, believes it would be prudentially unwise to speculate that the adjustment board will conclude that the transaction triggered the application of Rules 38 and 39. The railroads have a number of colorable defenses to present to the adjustment board, including that the transaction was simply not the type of disposition covered by Rules 38 and 39; that the union may not invoke the two rules because it failed to comply with the grievance procedures in the collective bargaining agreement; and that Rule 39 provides for 'interest arbitration' which is void for 'impossibility.'[7] Thus, the adjustment board could find in favor of the railroads, with the result that it will be unnecessary to reach the issue of Rule 39 arbitration. Moreover, the court believes it would be speculative to assume, absent even a finding of a violation, that the sole appropriate remedy would be arbitration pursuant to Rule 39. The court declines to engage in such speculation.

The IAM's petition to compel the railroads to arbitrate will therefore be denied, albeit without prejudice. An appropriate judgment will be entered.

---

7. Rule 17 in the collective bargaining agreement contains the grievance procedures for processing claims asserting that the railroads have violated the agreement. The rule provides that "all claims or grievances must be presented in writing by or on behalf of the employee involved, to the officer of the Carrier authorized to receive same, within thirty (30) days from the date of the occurrence on which the claim or grievance is based."