**AMERICAN TRAIN DISPATCHERS DEPARTMENT OF the INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Petitioner,**

v.

**NORFOLK SOUTHERN RAILWAY COMPANY, Respondent.**

No. 93 C 5783.

United States District Court,
N.D. Ill.,
Eastern Division.

July 21, 1994.

**4.** In the opinion of the Court, Plaintiff does not establish "influence" merely because it accepted Defendant's advice.

Stephen Jay Feinberg, Marvin Gittler, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, Michael S. Wolly, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, Washington, DC, for petitioner.

James Stanton Whitehead, Sidley & Austin, Chicago, IL, for respondent.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court are cross-motions of petitioner American Train Dispatchers Department of the International Brotherhood of Locomotive Engineers ("Union") and of respondent Norfolk Southern Railway Company ("Norfolk") for summary judgment. For the following reasons, the motion of the Union is denied, and the motion of Norfolk is granted.

### BACKGROUND [1]

█ The Union is a national labor organization authorized to act pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, as a bargaining representative on behalf of the train dispatchers employed by Norfolk. Norfolk is a rail company engaged in the business of transporting goods by railroad and falls within the definition of "carrier" as the term is defined under 45 U.S.C. § 151 First.

During the relevant period, the parties were bound to the terms of a collective bargaining agreement ("Agreement"). Article 3 of the Agreement, titled "REST DAYS, RELIEF SERVICE AND EMERGENCY SERVICE," states as follows:

(a) Each regularly assigned train dispatcher will be entitled and required to take two (2) regularly assigned days off per week as rest days, except when unavoidable emergency prevents furnishing relief. Such assigned rest days shall be consecutive to the fullest extent possible. The carrier may assign non-consecutive rest days only in instances where consecutive rest days would necessitate working any train dispatcher in excess of five (5) days per week. A regularly assigned train dispatcher required to perform service on the rest days assigned to his position will be paid at rate of time and one-half for service performed on either or both of such days....

(c) Relief requirements of less than four (4) days per week shall be considered extra work and will be performed by extra dispatchers, who shall be paid the rate of each position relieved.

---

1. The following background is drawn from the statement of material facts and exhibits stipulated by the parties for purposes of the cross-motions for summary judgment. The court recognizes that in order to properly bring a motion for summary judgment in the Northern District of Illinois, the movant must comply with Rule 12(m) of the Rules of the United States District Court for the Northern District of Illinois ("Local Rules"). In this case, however, because both parties moved for summary judgment and because they stipulated to the material facts, the court finds full compliance with the Local Rules unnecessary. Furthermore, the statement of stipulated facts satisfy the underlying purpose of Local Rules 12(m) and 12(n). (The court refers to Local Rules 12(m) and 12(n) because the motions were filed prior to the effective date, April 4, 1994, of amended Local Rules 12(M) and 12(N)).

(d) The doubling [2] of territory or positions for relief purposes will not be permitted, except as may be agreed by an officer of the Company and General Chairman....

(Stip. Ex. No. 1 at 6).

Prior to April 1, 1991, Norfolk's dispatching office at Knoxville, Tennessee, consisted of three dispatching positions.[3] Each dispatcher position covered three separate territories. The first territory referred to as "East End" covered the area from Knoxville to Asheville/Andover. The second position referred to as "West End" covered the area from Knoxville to Chattanooga/Oakdale–Jellico. The third territory referred to as "Memphis" covered the area from Chattanooga to Memphis, and the ICG line to Fulton, Kentucky. For various reasons, the first shift [4] dispatcher position for the Memphis territory grew particularly busy.

To alleviate the overload at the Memphis dispatching position, Norfolk created an additional first-shift dispatcher position. Norfolk issued a bulletin announcing the creation of a new dispatcher position. The bulletin described the new Knoxville District Dispatcher position to cover the territory from Sheffield Yard to Debutts Yard, from Clinton to Clairfield/Arco Mine, from Sevier Yard to Maryville, and from Sevier Yard to Middlesboro ("Knoxville Territory"). Essentially, the area assigned to the Knoxville District Dispatcher was a combination of certain tracks monitored by the Memphis and West End dispatchers.

The new position required the dispatcher to work from Monday through Friday, 8:00 a.m. until 4:00 p.m. Eastern Standard Time, and provided assigned rest days on Saturdays and Sundays. Norfolk granted the new position to train dispatcher J.R. Farr ("Farr"). Beginning April 1, 1991, Farr controlled the Knoxville Territory during the weekdays, Monday through Friday. During the weekends, however, the dispatchers from the Memphis and West End territories monitored the Knoxville Territory, as they did prior to April 1, 1991.

Because Norfolk assigned the Knoxville Territory to Memphis and West End dispatchers on Farr's rest days instead of employing additional dispatchers, the Union filed a claim with Norfolk that such conduct violated Article 3(d) of the Agreement. Norfolk denied the claim. After the parties reached an impasse in their efforts to settle the matter, they stipulated to the formation of a Special Adjustment Board in accordance with 45 U.S.C. § 153 Second to resolve their dispute. The resulting adjustment board was designated as Public Law Board No. 5234 ("Law Board").

After reviewing the written submissions and oral argument of the parties, the Law Board sustained the claim of violation as asserted by the Union. In so doing, the Law Board issued Award No. 1 ("Award") on April 19, 1993, and directed Norfolk to comply with it by April 30, 1993. But, before the Law Board issued its Award, on March 5, 1993, Norfolk eliminated the Knoxville Territory dispatcher position. Furthermore, after the parties reviewed Norfolk's payroll records, Norfolk paid a total of $30,261.74 to seven Norfolk train dispatchers in compliance with the Award. The amount of payment equaled the amount of compensation those seven dispatchers would have earned if Norfolk hired and assigned them to the Knoxville Territory during Farr's rest days. With the $30,261.74 payment, it would appear that Norfolk has fully complied with the Award; however, the Union takes a different position in light of Norfolk's later conduct.

On May 16, 1993, Norfolk issued Tennessee Division Dispatcher's Bulletin No. 1 which read as follows:

2. "Doubling," as the term is used under Article 3, of territories occurs when the territories of two or more train dispatchers are combined so that one dispatcher is required to cover a territory that is wider than his or her normal territory.

3. The parties employ the industry term "desks" to refer to positions in their briefs; however, the court will use the layperson's term "positions" in its opinion for clarity.

4. The parties employ the industry term "tricks" to refer to shifts in their briefs; however, the court will use the layperson's term "shifts" for clarity in its opinion.

The following Five (5) Day Position is now open for bids: Knoxville District Dispatcher–Territory Sheffield Yard to Debutts Yard, Clinton to Clairfield/Arco Mine, Sevier Yard to Maryville, And Sevier Yard to Middlesboro, Monday thru Friday. The Position Works As Follows: Monday Thru Friday 8:00 AM to 4:00 PM EST.

(Stip. Ex. No. 19). Norfolk's reason for restoring the position was to relieve the heavy workload imposed on the first shift dispatcher position for Memphis district. On May 22, 1993, Norfolk again selected Farr for the post. He began working at his new position on May 24, 1993, and has been working Monday through Friday since that time. The notable difference between this position and the position installed on April 1, 1991, is that this position is designated as a five day position with no assigned rest days.

Five days before granting the post to Farr, Norfolk Chief Dispatcher sent a teletype to the dispatchers of West End, Knoxville, and Memphis containing the following message:

EFFECTIVE MONDAY, MAY 17TH, 1993 THE KNOXVILLE DISTRICT DISPATCHERS' POSITION WILL BE REESTABLISHED PER CHIEF DISPATCHERS BULLETIN NO. 1.

BETWEEN THE HOURS OF 700AM AND 300PM CST MONDAY THRU FRIDAY ANYONE WORKING BETWEEN SHEFFIELD AND DEBUTTS YARD WILL CONVERSE WITH THE [KNOXVILLE DISTRICT] DISPATCHER ON THE RADIO AND CAN CONTACT HIM AT 521–1596. THE REST OF THE WEEK THIS TERRITORY WILL BE COVERED BY THE MEMPHIS DISPATCHER AT 521–1466.

BETWEEN THE HOURS OF 800AM AND 400PM EST, MONDAY THRU FRIDAY ANYONE WORKING BETWEEN CLINTON AND CLAIRFIELD/ARCO MINE, SEVIER YARD AND MARYVILLE AND SEVIER YARD AND MIDDLESBORO WILL CONTACT THE [KNOXVILLE DISTRICT] DISPATCHER ON THE RADIO AND AT PHONE NO. 521–1596. THE REST OF THE TIME THIS WILL BE HANDLED BY THE WEST END DISPATCHER AT 521–1468....

(Stip. Ex. No. 20). With the reestablishment of the Knoxville District coupled with the preceding teletype, the Union takes the position that the parties are right back to square one as to their dispute about Article 3(d). On July 1, 1993, the Union protested and claimed that Norfolk's conduct violates the Award and Article 3(d) of the Agreement. On July 13, 1993, Norfolk expressed its disagreement. Subsequently, on September 21, 1993, the Union filed the instant petition to enforce the Award.

## DISCUSSION

■ The narrow issue before the court is whether Norfolk's conduct of reestablishing the Knoxville District dispatcher position is a rerun of its April 1, 1991 action which ultimately resulted in an arbitration award in favor of the Union. The Union asserts that Norfolk's conduct of reestablishing the Knoxville District without assigning additional dispatchers on Saturdays and Sundays is in direct contravention of the Award. Norfolk on the other hand responds that it has fully complied with the Award and that reestablishing the Knoxville District dispatcher position violates neither the Award nor the Agreement. Norfolk further contends that the Union's claim in connection with the reestablishment of the Knoxville District is a separate and independent controversy from the earlier dispute and, therefore, requires further arbitration rather than judicial intervention under the RLA. The court agrees.

■ In 1926, the Congress enacted the RLA to prevent interruptions to interstate commerce and the operation of railroad carriers and to promote stability in the relationship between employees and rail carriers. 45 U.S.C. § 151a. To accomplish these objectives, the RLA mandates employees or their authorized representative and rail carriers to resolve minor disputes through arbitration. *Kulavic v. Chicago & Ill. Midland Ry. Co.*, 1 F.3d 507, 512 (7th Cir.1993). Disputes concerning the interpretation and compliance of a collective bargaining agreement are considered minor and they are subject to the mandatory alternative dispute resolution scheme.

45 U.S.C. § 153 First(i); *see also Consolidated Rail v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 305, 109 S.Ct. 2477, 2481, 105 L.Ed.2d 250 (1989) (Minor disputes are disputes that "may be conclusively resolved by interpreting the existing agreement."); *Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 924 (7th Cir.), *cert. denied,* ____ U.S. ____, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993) ("Minor disputes occur over contract interpretation.").

Under the RLA statutory scheme, when a minor dispute surfaces, the parties must first make a good faith attempt to resolve the dispute through negotiation. 45 U.S.C. § 153 First(i); *Elmore v. Chicago & Illinois Midland Ry.*, 782 F.2d 94, 96 (7th Cir.1986). In the event the parties are unable to settle the dispute, then the parties may submit the disputed claim to the National Railroad Adjustment Board ("NRAB") or to a Special Adjustment Board[5] for arbitration. 45 U.S.C. § 153 First(i), Second; *Kulavic*, 1 F.3d at 513. The RLA grants the NRAB the exclusive jurisdiction over these types of disputes. *Underwood v. Venango River Corp.*, 995 F.2d 677, 679 (7th Cir.1993).

■ Naturally, with the enactment of the RLA and its provision of mandatory arbitration, the function of the federal courts are limited in the area of railroad employment disputes. The RLA does permit the losing party to seek judicial review of an arbitral award. 45 U.S.C. § 153 First(q). Nonetheless, the scope of judicial review is "among the narrowest known to the law." *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978); *see also American Train Dispatchers Ass'n v. Norfolk & Western Ry. Co.*, 937 F.2d 365, 366 (7th Cir.1991). The only grounds on which a federal court may set aside an award or remand it for further proceeding before the appropriate board are as follows: "for failure of the [board] to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the [board's] jurisdiction, or for fraud or corruption by a member of the

[board] making the order." 45 U.S.C. § 153 First(q); *see also Riley v. National Passenger R.R. Corp.*, 814 F.Supp. 40, 41 (N.D. Ill.1993). By narrowing the scope of permissible judicial review, the RLA is able to ensure the finality and the binding nature of board awards. *Id.*

■ The RLA also allows the winning party to seek judicial enforcement of the award in the event the losing party does not comply with its terms. 45 U.S.C. § 153 First(p). The jurisdiction to enforce arbitral awards is likewise very narrow. The Court of Appeals for the Seventh Circuit has firmly held that "the judicial duty to enforce an arbitration award ... is neither a duty nor a license to interpret" the award. *Brotherhood Ry. Carmen v. Atchison, Topeka & Santa Fe Ry. Co.*, 956 F.2d 156, 160 (7th Cir.1992). Moreover, a federal court does not have the jurisdiction to define the scope of an arbitral award. *Brotherhood of Maintenance v. Burlington Northern Ry. Co.*, 24 F.3d 937, 939–941 (7th Cir.1994). Thus, if an arbitral award raises bona fide interpretation questions in the wake of post arbitration conduct, those inquiries must be satisfied by the appropriate adjustment board, not by a district court. *Atchison*, 956 F.2d at 160; *Burlington*, 24 F.3d at 941.

This is a case of judicial enforcement, not judicial review. Therefore, an examination of the Award is necessary to determine whether the court has jurisdiction to adjudicate the case on the merits, or remand the case to the Law Board for further arbitration. The Law Board began its inquiry with the Union's position on the interpretation of Article 3(a). The Union "construe[d] Article 3(a) to mean that a train dispatcher's position must be filled seven (7) days per week, including weekly rest days." (Stip. Ex. 14 at 3.) In addressing this position, the Law Board discussed two other awards in its opinion:

> In Award No. 7013, the Carrier established a second trick dispatcher position, five days per week. At the same time, it reduced the first trick position from seven

---

**5.** A Special Adjustment Board is simply a smaller version of the NRAB, and the parties frequently stipulate to use this Board rather than the NRAB

to expedite the dispute resolution process. *Kulavic*, 1 F.3d at 513.

to five days, abolished a relief position, and combined the territory of the latter position with the territory of other dispatcher positions. The Organization protested. The Carrier restored the first trick position to seven days per week and restored the relief position, thereby resolving the dispute. A short time later, however, the Carrier re-established the additional dispatcher position, but did not provide rest day relief service; choosing instead to double the territory of the additional position Saturday and Sundays with the territory of another trick dispatcher assignment.

As a result, the Organization filed a claim asserting that the Carrier's action violated a contractual provision substantially similar to Article 3(d) in this case. Significantly, the Carrier there, asserted almost the very same arguments that have been asserted by the Carrier here. There, as here, the Carrier argued that it had the right to establish an additional five-day dispatcher position, by assigning to it the duties that had been performed by other regularly assigned dispatchers. There, as here, the Carrier argued that the new position was added because of heavy traffic, Monday—Friday, and that it was not needed on Saturdays and Sundays. There, as here, the Carrier argued that the negotiated Agreement did not prohibit it from establishing a five-day position or require it to establish the additional position on a seven-day basis with rest day relief on Saturdays and Sundays.

Notably, the Adjustment Board in Award No. 7013 held that Article 4 (which is similar to our Article 3) forbade the Carrier's action. It found that while the Carrier's position presented a logical plan of operations, under the Agreement the Carrier's remedy was negotiated. The Adjustment Board therefore sustained the claim. In Award No. 10190, the Adjustment Board similarly concluded that the combining of dispatchers' positions can only be done by the agreement of the parties. There, the Carrier consolidated two dispatching offices and sought to reach agreement with the Organization to establish a seven day dispatcher position in the new office. The Carrier proposed to reduce

the new position to a five-day position and combine its duties on Saturday and Sunday for relief purposes, if traffic on those days declined.

Although the Organization rejected the proposal, the Carrier nevertheless established the new seven day dispatcher position. When traffic subsequently declined, the Carrier unilaterally reduced the seven day position to five days per week, and combined its duties with another dispatcher position on Saturdays and Sundays for rest day relief purposes.

The Adjustment Board in Award No. 10190 found that the Carrier's action constituted a violation of Rule 20(f), a contract provision similar to Rule 3(d) in this case. In reaching its conclusion, the Adjustment Board cited Third Division Award No. 5653, which held "It should be borne in mind that Carrier is obligated to do what, by its Agreements, it has contracted to do, although that may not always be the easiest or most economical manner of doing it."

*In this Board's view, Award Nos. 7103 & 10190 read in tandem lend credence to the [Union's] position that Article 3(d) was violated on Saturdays and Sundays, when the duties performed by the newly established dispatcher position on Monday through Friday, were performed by other regularly assigned dispatcher desks, without negotiation.*

(Stip. Ex. 14 at 3–5.) (Emphasis added). Although the Law Board began its discussion appearing to address the issue of whether Norfolk is required under Article 3(a) to fill its dispatcher positions seven days a week, including two rest days, its' final analysis only resolved the issue of whether Norfolk violated Article 3(d) by doubling territories on Saturdays and Sundays.

The Law Board never reached a conclusion as to whether Norfolk has the right under the Agreement to advertise and create a five day dispatcher position without assigned rest days. It recognized that Award No. 5898 held that a *"Carrier has a right under the Agreement to advertise and establish 5, 6, or 7 day positions as it wishes . . . ."* (Stip. Ex.

14 at 7.) The Law Board did criticize the lack of basis and rationale for that holding, but it did not disagree or reject Award No. 5898. The Law Board simply held that even under Award No. 5898, Norfolk violated Article 3(d) because the position installed on April 1, 1991 was deemed to be a seven day position, not a five day position.

▮ Furthermore, the Law Board's findings are limited to the facts as submitted by the parties at the arbitration. The Law Board phrased its findings as follows:

> Within the parameters of the Awards cited by both parties, we find that the newly established first shift *Knoxville dispatcher position, as advertised, was a seven day position, Monday through Friday, with regularly assigned rest days, Saturday and Sunday. We further find that under the particular circumstances of this case* the duties of the new first shift Knoxville dispatcher position were combined for relief purposes on Saturdays and Sundays with the Memphis and West End dispatcher desks in violation of Article 3(d) of the subject Agreement.

(Stip. Ex. 14 at 8.) (Emphasis added). This paragraph demonstrates that the Law Board's opinion and findings are restricted to the challenged seven day position with assigned rest days on Saturdays and Sundays. In the instant action, the challenged conduct is a five day position with no assigned rest days according to the advertisement bulletin. Albeit the ultimate effect of the five day position is identical to the seven day position considered by the Law Board, the quoted opinion limits its findings to a seven day position.

The Award No. 1 does not add or expand its applicability of the Award or provide helpful instructions on the future conduct of Norfolk. The Award simply states that the Law Board sustains the claim of the Union, which described the seven day position. Under these circumstances, an inquiry into the issue of whether the advertised five day position is essentially a seven day position previously found to be violative of Article 3(d) would

necessarily require the court to interpret both the Award and the Agreement.

While it would not be unreasonable to interpret the Law Board's discussion to apply to the establishment of a five day position without rest days, it is not the duty or function of this court to define the scope of the Award or to interpret the Agreement. There is a genuine disagreement between Norfolk and the Union about the meaning of the Award, and such disagreement amounts to a minor dispute about the construction of the Agreement. *Burlington,* 24 F.3d at 938. Thus, under the RLA, the dispute before the court must be resolved by arbitration, not by judicial intervention. 45 U.S.C. § 153 First(i).

### CONCLUSION

For the foregoing reasons, the motion of the Union for summary judgment is denied, and the cross-motion of Norfolk for summary judgment is granted. The case is remanded [6] to the Law Board for further proceeding and resolution.

IT IS SO ORDERED.

---

**6.** The Seventh Circuit in *Atchison* noted that a remand order to the Special Adjustment Board is preferred over dismissal to facilitate expeditious resolution of employment disputes. *Atchison,* 956 F.2d at 160.