**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, DIVISION 269 and Stephen Piconi and 159 Other Members of the Brotherhood of Locomotive Engineers, Division 269, Plaintiffs,**

v.

**The LONG ISLAND RAIL ROAD COMPANY and Thomas F. Prendergast as President and Dale C. Kutzbach as Vice President of Labor Relations, Defendants.**

CV–95–4098.

United States District Court, E.D. New York.

Oct. 17, 1995.

---

William Placke, Holm Krisel & O'Hara, New York City, for Plaintiffs.

Roger J. Schiera, Deputy General Counsel, General Law, Long Island Rail Road, Law Department–1123, Jamaica, NY, for Defendants.

## MEMORANDUM AND ORDER

AMON, District Judge.

### Introduction

Plaintiffs seek a preliminary injunction barring the Long Island Railroad's imposition of a disciplinary fine. For the reasons stated below, plaintiffs' motion is denied and their case is dismissed.

### Facts

On May 26, 1995, the plaintiffs in this case, all members of the Brotherhood of Locomotive Engineers (BLE), refused to report to their jobs on the Long Island Railroad (LIRR). This concerted job action halted all train service on the Long Island Railroad on the Friday before the Memorial Day holiday. In response to this walk-out, the LIRR immediately commenced a civil action seeking injunctive relief against the BLE, *LIRR v. BLE, et al.*, 95 CV 2142(FB). On May 26,

1995, the Honorable Edward R. Korman, sitting as Miscellaneous Judge, issued a temporary restraining order compelling the engineers to return to work. The LIRR contends that it served the order in time for BLE members to report back to work in time to salvage the evening rush hour on May 26, 1995.

When BLE members failed to report to work during the afternoon of May 26, the LIRR returned to court to have the BLE and its members held in contempt for disobeying the court's order. In late June, and again in August, the Honorable Frederic Block held hearings on the LIRR's motion to hold the BLE and its members in contempt. While the court's decision on the contempt motion was pending, the parties settled their dispute, signing a settlement agreement on September 12, 1995.

After the commencement of the civil action, the LIRR instituted disciplinary actions against all BLE members who failed to report to work on May 26. As a result of these hearings, the LIRR assessed fines against all of the engineers. For 158 of these individuals, the fines equalled 5 days of pay—approximately $1,000. Two engineers, with records of past disciplinary issues, received fines equalling 8 days of pay, or approximately $1,600.

Pursuant to the collective bargaining agreement, the fined BLE members had a right to internally appeal the disciplinary action taken by the LIRR at two levels before proceeding to arbitration under § 3 of the Railway Labor Act. 45 U.S.C. § 153 (1995). Soon after the initial imposition of the fines, the fined BLE members took their first level of appeal to the Acting Chief Transportation Officer of the LIRR. The Acting Chief Transportation Officer affirmed the original assessment of the fines against the BLE members, notifying the union of this decision by a letter dated August 9, 1995.

While the BLE followed this appeals process, the BLE and the LIRR engaged in negotiations both to settle their pending civil action and to finalize a collective bargaining agreement. On September 12, 1995, the LIRR and the BLE settled their pending action, agreeing, *inter alia*, that the LIRR would reserve the right to pursue its pending disciplinary actions against the BLE membership.

After the LIRR and the BLE settled their civil action, they also finalized their collective bargaining agreement. On September 21, 1995, this new collective bargaining agreement between the LIRR and the BLE became effective. Among other things, this agreement grants BLE members retroactive pay increases. At oral argument, the parties informed the Court that these increases will result in payments of, on average, between $6,000 and $7,000 in back pay for each of the plaintiffs in this action sometime within the month of November, 1995.

The day after the collective bargaining agreement became effective—September 22, 1995—the LIRR informed the Union that the BLE members had not availed themselves of their final level of appeal and that it intended to impose the fines as a result.[1]

From September 22, 1995 through October 2, 1995, the LIRR and the BLE negotiated over whether fines would be imposed. On October 2, 1995, these talks broke off. On October 4, 1995, the LIRR sent the BLE a sample letter it intended to distribute to Union members who had participated in the May 26 action.

The LIRR letter states that each BLE member involved in the "illegal concerted work stoppage" would be assessed a fine equivalent to five days pay for 158 members, eight days for two others. To collect this fine, the LIRR intends to deduct one day's pay from successive, bi-weekly paychecks beginning October 12, 1995 until the entire amount of the fine is deducted.

The BLE argues that this action: (1) undermines its Collective Bargaining Agreement, (2) violates the Railway Labor Act, (3)

---

1. The BLE concedes that it could have sought the status quo injunction it now seeks immediately upon assessment of the fines in June without going through the internal appeals process as it did. The BLE states that it submitted to the internal appeals offered by the LIRR because its efforts were focused on concluding the negotiation of a new collective bargaining agreement. *See* Tr. of Oral Argument of October 11, 1995, pp. 25–26.

violates New York Labor Law § 193, and (4) "is inimical to the labor peace supposedly secured within the past several weeks." Pl. Mem. of Law pp. 3–4. The BLE, therefore, seeks this preliminary injunction.

### Discussion

This dispute is governed by the Railway Labor Act (RLA), 45 U.S.C. § 151, et seq. (1995). The BLE claims that the LIRR's imposition of fines violates § 2 Seventh and § 6 of the RLA. 45 U.S.C. §§ 152 Seventh, 156 (1995).

Under § 2 Seventh of the RLA, a railroad may not "change the rates of pay, rules, or working conditions of its employees ... except in the manner prescribed in section 156" of the RLA. 45 U.S.C. § 152 Seventh (1995). Section 156 (commonly referred to as § 6 of the RLA) dictates that a party wishing to change "rates of pay, rules, or working conditions" must provide the other side with at least thirty days written notice before instituting such a change. 45 U.S.C. § 156 (1995). If the notified party objects to the change, then the proposed change is subject to a detailed and lengthy process of mediation.

■ During this process, "the rates of pay, rules, or working conditions shall not be altered." *Id.* In other words, the status quo shall be maintained. In such cases, "the district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures," *Consolidated Rail Corp. v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 302–303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989) (hereinafter "Conrail"). This is commonly referred to as a "status quo injunction."

The BLE argues that the imposition of fines amounts to a change in rates of pay, rules, or working conditions and should, therefore, be subject to the requirements of § 156. Because the LIRR gave the BLE no formal § 156 notice of its intention to impose fines, the BLE contends that the imposition of fines amounts to a violation of § 156 and

§ 152 Seventh.[2] This, the BLE asserts, entitles the union to a status quo injunction until this matter can be resolved.

The LIRR contends, by contrast, that these fines are not changes in rates of pay, rules, or working conditions, but, rather, are disciplinary actions that fall within the implied terms of the existing collective bargaining agreement as informed by the practice of the parties. As such, the LIRR contends, these fines do not represent a prohibited unilateral change in "rates of pay, rules, or working conditions" as prohibited by § 2 Seventh. Rather, the LIRR argues that this dispute should be governed by § 2 Sixth and § 3 First(i) of the RLA.

Under § 2 Sixth of the RLA, disputes between a railroad and its employees "arising out of grievances or out of the interpretation or application of agreements" must initially be handled by proceedings conducted between the parties. 45 U.S.C. § 2 Sixth (1995). Should these proceedings fail, § 3 First(i) of the RLA dictates either party may seek arbitration through the Railway Adjustment Board. 45 U.S.C. § 153 First(i) (1995).

■ The primary issue in this case is whether the parties' disagreement about the imposition of fines shall be governed by the lengthy mediation process dictated by § 6 or by the less involved arbitration process of § 3 First(i).

Resolution of this issue depends upon whether the dispute is characterized as a "major dispute" or whether it is deemed a "minor dispute". See *Elgin Joliet & Erie Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). The parties agree that according to the RLA, this court has jurisdiction to issue an injunction only if this is a "major dispute." *Consolidated Rail Corp. v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 302–303, 109 S.Ct. 2477, 2480 (1989). If this court finds that it is a "minor" dispute, it may not issue an injunction and must dismiss the case, leaving the BLE with the option to pursue arbitration. Should this

---

**2.** Because the newly entered into collective bargaining agreement forbids both sides from proposing changes to the collective bargaining agreement pursuant to § 156 until 1999, the

BLE also argues that the LIRR's proposed fine is impermissible as a violation of the recently signed collective bargaining agreement.

court determine that this is a "major" case, then the parties will be required to submit to the lengthy mediation process outlined in § 6 of the RLA. *Conrail,* 491 U.S. at 303, 109 S.Ct. at 2480–81.

The Supreme Court has defined a major dispute as one which:

relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Elgin Joliet & Erie Ry. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945).

By contrast, a minor dispute:

relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case. In the latter event the claim is founded upon some incident of the employment relation ... independent of those covered by the collective bargaining agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Id.*

At oral argument, the parties agreed that there are no disputed issues of material fact in this case. And, although both sides were prepared to present witness testimony regarding the background of this dispute at the hearing held on October 11, 1995, neither found it necessary to call witnesses to the stand.

The BLE's chief contention is that the proposed fines amount to a redefinition of the newly crafted Collective Bargaining Agreement and, as such, must be considered a "major" dispute under the RLA. The LIRR's response, in short, is that this issue is more properly characterized as a "minor" dispute.

As noted above, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail,* 491 U.S. at 302, 109 S.Ct. at 2480. To apply this maxim, the *Conrail* Court established the "arguably justified" test:

[I]f an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the [National Railroad Adjustment Board].

*Conrail,* 491 U.S. at 310, 109 S.Ct. at 2484 (emphasis added). According to the *Conrail* Court, this test exemplifies the "relatively light burden" a railroad must bear "in establishing exclusive arbitral jurisdiction under the RLA." *Conrail,* 491 U.S. at 307, 109 S.Ct. at 2482.

In a summary of the "arguably justified" test, the Second Circuit explained that, to meet this test, "an employer need demonstrate only that a reasonable trier of fact could adopt the employer's view of the contract" for a dispute to be deemed minor. *Assoc. of Flight Attendants v. United Airlines,* 976 F.2d 102, 105 (2d Cir.1992). By contrast, "the court must conclude that any reasonable trier of fact would find virtually as a matter of law that the employer has violated the contract" to characterize the dispute as major. *Id.*

Turning to the application of the "arguably justified" test, the BLE argues that "the LIRR cannot forthrightly argue that an imposition of a fine on an employee is explicitly or implicitly contemplated by the Agreement." Pl.Mem. of Law p. 7. To bolster this contention, the BLE points to the language of the collective bargaining agreement, particularly Article 29 (Discipline). *See Pl. Exh.B* p. 57–59. This language, the BLE asserts, "does not even remotely hint at the possibility of an employee having pay deducted from his or her salary as a measure of discipline." Pl.Mem. of Law p. 7. Instead,

the BLE argues, the agreement limits the LIRR to three possible modes of discipline: reprimand, suspension, and termination.

The BLE also seeks to rely on the past course of conduct of the two parties under the collective bargaining agreement. *See Conrail,* 491 U.S. at 311, 109 S.Ct. at 2485 ("the parties' 'practice, usage and custom' is of significance in interpreting their agreement"). This history, the BLE argues, includes no history of the imposition of fines at the LIRR or in the industry. As a result, the BLE contends, fines do not fall within the terms of the agreement and their imposition, therefore, amounts to the addition of new terms to the labor contract.

The LIRR counters the BLE's argument by claiming that the fines it intends to impose are consistent with its implied authority to fashion appropriate discipline under the collective bargaining agreement. As such, the LIRR argues, the BLE's objection is more properly the subject of "minor" dispute arbitration, because it concerns the interpretation of the implied provisions of the collective bargaining agreement.

To evaluate the merits of the parties' contentions, the Court first looks to the terms of the collective bargaining agreement. The LIRR contends, and the BLE concedes, that the collective bargaining agreement neither authorizes nor prohibits the imposition of fines.[3] On this narrow issue the agreement is silent. The agreement does, however, address the broader issue of discipline in Article 29.

Article 29, the discipline section of the collective bargaining agreement, sets forth detailed procedural requirements for the imposition of discipline. While Article 29 does not explicitly grant the LIRR the authority to impose any particular form of discipline, it also does not prohibit any particular form of discipline. Article 29, however, does imply the existence of at least three forms of discipline: reprimand, suspension, and dismissal. The BLE concedes that the LIRR enjoys these "implied" powers, even though these sanctions are not specifically enumerated as

forms of discipline but are referred to in setting forth the procedural requirements for imposing discipline in the agreement.

When terms of an agreement must be inferred, it is often helpful to examine the prior practices of the parties and the custom within the industry. The reasoning in *Conrail* supports this approach.

In *Conrail,* the Court based its determination on past practices of the parties. *Conrail,* 491 U.S. at 311, 109 S.Ct. at 2485. The Court pointed out that "collective-bargaining agreements may include implied, as well as expressed terms. Furthermore, it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Id.*

Turning to the practice and custom of the parties in this case and the railroad industry in general, the parties do not dispute the material facts. Instead, like the parties in *Conrail,* they dispute how these facts should be interpreted.

In support of its position that past practice and custom do not allow for the imposition of fines, the BLE notes that the LIRR has never imposed a fine in the manner proposed here as a form of discipline. Moreover, the BLE also believes that no other railroad has ever imposed a fine on its employees. While the LIRR does not contest these assertions, it provides ample evidence to show that past practice arguably justifies its position that fines may be imposed.

To do this, the LIRR points to a history of past practice that, while not specifically including a history of the imposition of fines, shows that the carrier has historically had flexibility to fashion disciplinary measures beyond the three forms of punishment—reprimand, suspension and dismissal—which are clearly implied in the agreement. As a result, the LIRR can "arguably justify" its position that fines are allowable by offering non-frivolous and not obviously insubstantial reasons why past practice, usage and custom provide it with a basis for imposing fines.

---

**3.** The LIRR, in its papers and at oral argument, spoke of the "omitted case." The court reads this argument to mean that the LIRR contends

that there are implied terms to the collective bargaining agreement.

First, the LIRR points out that when an engineer faces punishment for taking drugs or drinking alcohol while on duty, the LIRR has historically had the right to compel the employee to attend substance abuse counseling. Similarly, employees who have committed safety infractions may be forced by the LIRR to attend retraining sessions on their own time without compensation. Both of these sanctions show that the LIRR has exhibited some degree of flexibility in imposing disciplinary measures beyond reprimand, suspension or dismissal.

Next, the LIRR has the authority to restrict the assignment of engineers who have committed serious work rule violations. These restrictions represent an economic imposition on disciplined workers because they restrict the amount of overtime a worker may earn.

Third, the railroad explains that if engineers lose certain keys issued to them, the LIRR will deduct the value of the lost key from the worker's paycheck. While this charge is not punitive, and neither party characterizes it as a fine, it does provide the railroad with some arguable basis on which to make a colorable claim that there is a history between the two parties of making disciplinary payroll deductions.

Fourth, the LIRR stresses that the BLE submitted to the "minor" dispute forms of adjudicating the fine issue when it was first presented in June. While not dispositive, this fact bolsters the conclusion that the LIRR's position is arguably justified.

Finally, the position of the LIRR that the proposed fines do not represent a marked departure from existing disciplinary practice is not untenable. To be sure, of the three forms of punishment the BLE concedes are within the LIRR's discretion, one is analogous to the fines at issue, and one is more severe.

Suspension, like a fine, deprives a railway worker of pay. The BLE contends that because a suspended worker does not work when pay is withheld and the fined worker does, a fine somehow works a draconian departure from the discipline practices the BLE accepts. Even if one were to accept the questionable proposition that a fine is more onerous than a suspension, a fine cannot be viewed fairly as a radical departure from the accepted disciplinary practices.

Dismissal is obviously more severe than a fine. To suggest that a less severe penalty than one admittedly at the LIRR's disposal is a "draconian" departure, as the BLE does here, is not persuasive. As a consequence, this court concludes that the imposition of a fine is arguably within the continuum of discipline that can be implied under the existing contract based upon the parties' course of conduct.

In sum, although this may be a close case, the history of punishment beyond reprimand, suspension and dismissal supports the conclusion that the LIRR's claim that it has the implied right to impose fines is neither frivolous nor obviously insubstantial.[4] As a result, this court concludes that this dispute is minor and, therefore, outside of its jurisdictional authority.

As the Court noted in *Conrail*, however, this court does not seek "to minimize any force in the Union's arguments that the discretion afforded [the railroad] by the parties' implied agreement, as interpreted in light of past practice, cannot be understood to extend this far." *Conrail*, 491 U.S. at 320, 109 S.Ct. at 2489. Thus, this court in no way suggests that the LIRR should ultimately prevail on the merits of this dispute at arbitration.[5]

This does not, however, take away from the persuasive power of the LIRR's central contention—that the course of dealing be-

4. Although the Court could find no cases with facts similar to the situation presented here, it did find a number of other courts that have characterized controversies regarding disciplinary matters as "minor disputes" under the RLA. *See, e.g., Independent Union of Flight Attendants v. Pan Am*, 789 F.2d 139, 141 (2d Cir.1986); *National R.R. Passenger Corp. v. IAMAW*, 915 F.2d 43, 50 (1st Cir.1990).

5. In reaching its decision here, the Court does not mean to endorse the sweeping proposition espoused by the LIRR that discipline is always a matter of "management prerogative" as that term is usually defined in the context of labor disputes and that it has the unfettered discretion to act in anyway it sees fit.

tween the parties provides "arguable justification" for its imposition of fines.

### Conclusion

For the reasons stated herein, this court concludes that the present dispute is "minor" under the terms of the Railway Labor Act. Consequently, plaintiff's motion for a preliminary injunction is denied and the case is dismissed.

SO ORDERED.