**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,**
Plaintiff,

v.

**LONG ISLAND RAIL ROAD,**
Defendant.

No.  03–CV–5804 (NGG).

United States District Court,
E.D. New York.

Jan. 13, 2004.

Fredrick J. Richman, Solomon, Richman, Greenberg, P.C., Lake Success, NY; and Michael S. Wolly, Zwerdling, Paul, Leibig, Kahn, Thompson, Wolly, PC, Washington, DC, for Plaintiff.

Stephen N. Papandon, The Long Island Rail Road Company, Jamaica, NY, for Defendant.

## MEMORANDUM & ORDER

GARAUFIS, District Judge.

Now before the court is the motion of Plaintiff International Brotherhood of Electrical Workers ("IBEW") for a preliminary and permanent injunction barring defendant Long Island Rail Road ("LIRR") from assigning certain IBEW members to work a shift from 4 P.M.—12 A.M. For the reasons outlined below, IBEW's motions are DENIED and the complaint is DISMISSED for lack of subject matter jurisdiction.

**Factual Background**

The basic facts as outlined herein are not disputed by the parties. On October 16, 2003 John Collins, LIRR's Acting Principal Engineer, sent IBEW General Chair Thomas Leibold a letter in which Collins announced that as of November 18, 2003 twenty-four IBEW jobs in the Maintenance of Way ("MW") Department would be abolished, jobs with shifts of 8 A.M.—4 P.M. from Monday through Friday. Leibold Declaration at 4–5. The letter informed Leibold that as of November 19, 2003 twenty-four new jobs would be established, but only fourteen of those would have the same shifts as the abolished jobs; the other ten new jobs would have a shift of 4 P.M. to 12:00 A.M., Monday through Friday. Id. at 5. The LIRR wished to use the late shift on a project involving an electrical substation at the Flatbush Avenue Yard, which is occupied by trains during the day. Affidavit of John Collins at 2.

LIRR believes this particular project will last approximately three months from its commencement. Id. at 2–3. Soon after receiving the letter from Collins Leibold protested the new shift, over the phone and in person, to LIRR's Director of Labor Relations, S.M. Drayzen. Leibold Declaration at 5. Leibold argued that the shift change would violate the collective bargaining agreement ("CBA") between the parties, LIRR could not make this move unilaterally, and IBEW did not give LIRR permission to do so. Id. Drayzen said the dispute was "minor," as it concerned the interpretation of the CBA, so it must be arbitrated. He refused to rescind the shift change, and on November 19 the LIRR made the change in shift times for the ten employees in question. Id. at 6. IBEW's lawsuit for an injunction followed.

The parties agree that the relevant section of the CBA is found at Rule 9A ("Starting Time and Meal Period–MW"):

(a) There may be one, two, or three shifts employed. The starting time of the work periods for regularly assigned service shall be arranged by agreement between the Carrier and the General Chairman, based on normal service requirements. When the normal starting time does not meet actual service requirements as regulated by the character of work and train service, this starting time may be changed to not earlier than 5:30 A.M. or later than 8:30 A.M. upon sixteen (16) hours notice to the employees affected.

(b) The time and length of the meal period shall be subject to mutual agreement.

(c) Where three shifts are employed in continuous service, the spread of each shift shall consist of eight (8) consecutive hours including an allowance of thirty

(30) minutes for meal within limits of the fifth hour.

(d) Lapped shifts shall not be established except where the requirements of service cannot be met by other equally economical arrangements.

Exh. B to Collins affidavit.

## Legal Standards

■■■ The parties do not dispute the content of the law in this area. IBEW points to the Railway Labor Act ("RLA"), specifically 45 U.S.C. § 152(1), which effectively prohibits carriers (like LIRR) from unilaterally changing work rules. In order to change work rules the LIRR must serve a bargaining notice on the IBEW under Section 6 of the RLA, thus beginning a rule-bound collective bargaining process. When a carrier attempts to make such a unilateral change over the protests of the union, the parties are engaged in what the Supreme Court first called in *Elgin, J. & E. Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), a "major dispute." A major dispute:

> relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

*Id.* at 723, 65 S.Ct. 1282. During a major dispute, if an employer attempts to violate the "status quo" by imposing new work rules (among other things) district courts have subject matter jurisdiction to enjoin such a violation, even without the normally required showing of irreparable injury. *See Consolidated Rail Corp. v. Railway Labor Execs. Assoc.,* 491 U.S. 299, 302–03, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (hereinafter *"Conrail"*).

■■■ LIRR does not question the validity of these laws and cases; rather, it argues that the case at bar does not constitute a "major dispute," but rather a "minor dispute." The definition of minor dispute is rooted in 45 U.S.C. § 152(6), which covers disputes arising "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." Again in the words of *Burley,* such a dispute:

> contemplates the existence of a collective agreement already concluded, or at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

*Burley,* 325 U.S. at 723, 65 S.Ct. 1282. District courts do not have subject matter jurisdiction over minor disputes; these matters must instead be grieved before an arbitration board. *See Conrail,* 491 U.S. at 303–04, 109 S.Ct. 2477. The threshold question of jurisdiction, therefore, turns on whether the disagreement between the parties constitutes a major or minor dispute.

■■■ Both the Supreme Court and the Second Circuit have within the last fifteen years clarified how district courts should examine whether a dispute is major or minor. In *Conrail,* 491 U.S. at 307, 109 S.Ct. 2477, the court approvingly quoted the Third Circuit for the proposition that an employer has a "relatively light burden" in establishing that a dispute is minor. The court explained further:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.* The Second Circuit has affirmed that "in order to meet *Conrail's* 'arguably justified' test, 'an employer need demonstrate only that a reasonable trier of fact could adopt the employer's view of the contract.'" *Brotherhood of Locomotive Engineers Div. 269 v. Long Island Rail Road,* 85 F.3d 35, 38 (2d Cir.1996), *quoting Assoc. of Flight Attendants v. United Airlines, Inc.,* 976 F.2d 102, 105 (2d Cir.1992). To summarize, the relevant tests for the threshold question of jurisdiction are whether LIRR's argument that this dispute is about the interpretation of Rule 9A is "arguably justified" or adoptable by a "reasonable trier of fact," or, on the other hand, whether LIRR's argument is "frivolous or obviously insubstantial."

### Arguments

IBEW argues that LIRR's assigning these ten workers to a 4 P.M.—12 A.M. shift violates the status quo, because MW Department workers have never, for decades in the past, worked any shift but 8 A.M. to 4 P.M. IBEW stresses that the language of Rule 9A is that "The starting time of the work periods for regularly assigned service shall be arranged by agreement between the Carrier and the General Chairman" and claims that the General Chairman has never assented to any shifts beginning at 4 P.M. In fact, asserts IBEW, LIRR has repeatedly attempted to change this rule through the collective bargaining process, so as to be able to start shifts at 4 P.M. Specifically, in 1995, 1998, and 2002 LIRR submitted a "Rule 6 Notice" to IBEW that it wished to bargain over Rule 9A and change its relevant terms to "The Carrier will have the right to establish or change shift starting times and relief days without restriction." In both the 1995 and 1998 bargaining rounds LIRR ultimately accepted the version of Rule 9A as it stands now, and the 2002 bargaining round is ongoing. This bargaining history proves, argues IBEW, that LIRR is trying to unilaterally change the status quo so as to achieve a change in working conditions it has been unable to obtain at the bargaining table. Similarly, says IBEW, when in the past LIRR has attempted to make a unilateral move such as this one IBEW has protested, and LIRR has backed away from the proposed change or has obtained IBEW's permission—this past course of conduct demonstrates that LIRR has traditionally agreed with IBEW's interpretation of the agreement.

LIRR responds in a number of ways. First, LIRR points to the first sentence of Rule 9A(a), which states that "There may be one, two or three shifts employed." Since there is undisputedly an 8 A.M.—4 P.M. shift in the MW Department, it follows that there is also a 4 P.M. to 12 A.M. shift (and a 12 A.M.—8 A.M. shift as well). LIRR further claims that MW electricians have worked a shift from 4 P.M. to 12 A.M. for decades, without objection or special permission from IBEW, and LIRR has submitted voluminous affidavits and exhibits in support of that claim. In those situations no agreement from IBEW was required, and more generally no agreement is necessary for LIRR to move MW workers from one established shift, such as 8 A.M. to 4 P.M., to another, such as 4 P.M.—12 A.M. Next, LIRR argues that the need to obtain agreement from the General Chair for starting times of regularly assigned service applies only to situations where the LIRR wishes to "create" an entirely new shift, such as a "lapped shift" from 11 A.M. to 7 P.M., as referred to in Rule 9A(d). In fact, says LIRR, the freedom to create such "new" and "lapped" shifts is what LIRR was trying to achieve when it sent the Section 6 bargaining notices to IBEW—notices that apply to other unions and other departments, like the

ME Department, where there was definitely a 4 P.M. to 12 A.M. shift already in place. LIRR also points to: (1) the fact that IBEW electricians in the ME Department work under near–identical contract language and often work a 4 P.M.—12 A.M. shift without special permission; and (2) the decision of an arbitration panel adjudicating a similar complaint by Sheet Metal Workers who also work under similar language, where the arbitrator agreed with the LIRR's position.

In its reply brief IBEW insists that the MW Department, the only group of LIRR workers actually covered by Rule 9A and therefore the only group relevant in this dispute, has never had a "regular" shift from 4 P.M.—12 A.M. Through declarations of past and present IBEW General Chairmen IBEW explains that nearly all of the situations cited in LIRR's declarations and exhibits relate to "two-man emergency crews," teams of electricians who, continuously since IBEW gave permission in 1949, could be assigned to shifts other 8 A.M.—4 P.M. These crews "rove the entire railroad, handling electrical emergencies as they happen under the direction of the Power Director." *See, e.g.,* Bove Declaration at 3. All other MW employees "hold positions on a maintenance gang and work under the supervision of a gang foreman." *Id.* The remaining situations cited by LIRR are those occasions when IBEW did give permission or, if not, LIRR rescinded the attempted change after IBEW protested. Therefore, the past practice of LIRR itself shows that LIRR has interpreted Rule 9A as IBEW submits it should be interpreted.

LIRR responds in its own sur-reply affidavits that it is unaware of any 1949 agreement (and IBEW points to no written agreement from 1949 or since then) that two-man crews are "emergency crews" somehow exempt from rules that apply to other MW workers—these workers perform regularly assigned tasks. Further, LIRR disputes IBEW's characterizations of the incidents described where LIRR supposedly changed course or requested permission after IBEW changed a shift to 4 P.M.—12 A.M. Specifically, LIRR points to the following situations: (1) in 1993 a group of four MW electricians worked on a lighting project on the 4 P.M.—12 A.M. shift (though their hours were modified at the General Chairman's request to 3:30 P.M.—11:30 P.M.); (2) in 1997 five MW electricians worked on a project from 4 P.M.—12 A.M. without LIRR requesting permission; (3) in 2001 LIRR changed a shift time after IBEW protested, but only because the originally proposed shift was a "lap shift" from 9 P.M.—5 A.M., not because MW electricians may only work from 8 A.M.—4 P.M. *See* Sur-reply Affidavit of Robert Puciloski at 3–4.

**Analysis**

■ After considering the above arguments and examining the affidavits and declarations submitted by the parties, I find that LIRR's arguments are not "frivolous or obviously insubstantial," but rather that they are at the very least "arguably justified" and could be accepted by a "reasonable" trier of fact. I do not find that the record before me conclusively supports the proposition that LIRR's changing the shift time for these ten MW electricians constitutes a change in the status quo that exists between the parties. LIRR's interpretation of Rule 9A is a plausible one, first under the language of the rule itself, which states "There may be one, two, or three shifts employed." If LIRR "may" employ one, two, or three shifts, and the first shift runs from 8 A.M.—4 P.M., it is at the very least "not frivolous" for LIRR to argue that under Rule 9A LIRR "may" assign MW electricians to work a second shift immediately after the 8 A.M.—4 P.M.

shift ends. While the next sentence of Rule 9A does require regularly assigned service starting times to be arranged with the General Chairman, it is not "frivolous" to argue that this sentence must be read in the context of the whole rule—the rule specifically allows for three shifts and discourages "lap shifts." Hence, if an established shift runs from 8 A.M.—4 P.M., it may be assumed that another "regular" shift runs immediately following, from 4 P.M.—12 A.M.; a "reasonable" trier of fact could find that by agreeing to an 8 A.M.—4 P.M. shift the General Chair has impliedly agreed to a 4 P.M.—12 A.M. (and a 12 A.M.—8 A.M.) shift as well.

Not only is the interpretation of the agreement debatable enough for LIRR to meet its "light burden" of showing that jurisdiction lies with an arbitrator rather than this court, so is the relevant history of the shift in question. While this history is vigorously disputed, I find that even if IBEW does have a good-faith reason for differentiating these two-man crews from the kind of assignment that sparked this lawsuit, the fact remains that MW electricians worked on this shift for decades, without permission from the General Chairman and with no exceptional status carved out for them in the CBA. Thus, LIRR once again has not posed a "frivolous or insubstantial" argument that in assigning these ten workers to the 4 P.M.—12 A.M. shift it is exercising its rights under Rule 9A as it has in the past, rather than unilaterally changing the status quo. In addition to the support provided by the existence of two-man crews, I separately rely on the situations cited by Mr. Puciloski in his sur-reply affidavit,

where he details two occasions where MW electricians (in groups of more than two) did work on the 4 P.M.—12 A.M. shift. This account independently provides sufficient support to LIRR's version of the history of these shifts, such that a "reasonable trier of fact" could find for LIRR. Finally, there is arguably precedent for the notion that the very fact that IBEW and LIRR dispute this issue means that the dispute is minor. *Cf. Air Line Pilots Assoc. v. Delta Airlines, Inc.*, 1999 WL 684169, at *3 (E.D.N.Y. July 29, 1999) (Citing *Conrail* for the proposition that "In any event, the dispute over whether the written contract provision controls over ALPA's past understanding is a 'minor dispute' beyond the jurisdiction of this court").

Regarding another of IBEW's arguments, I find that LIRR's having issued a Section 6 notice in 2002 (and in the 1990's) relating to this issue does not therefore mean that LIRR is attempting to change the status quo. LIRR's argument that its Section 6 notice was intended to commence bargaining on the issue of "lap shifts," rather than on the issue of whether there could be a regular 4 P.M.—12 A.M. shift at all in the MW Department is, yet again, not "frivolous." Further, the fact that LIRR sent the same Section 6 notices to other departments, like the ME Department, that unquestionably have a regular 4 P.M.—12 A.M. shift, tends to show that LIRR's proffered rationale for the Section 6 notice is true.[1]

In finding that the instant dispute is a minor one over which I have no jurisdiction, I make no judgment about which

---

1. In this decision I do not, however, rely on LIRR's argument that because the ME Department and another union have similar contract language and a 4 P.M.—12 A.M. shift, the MW Department must also therefore have such a shift under Rule 9A. The MW Depart-

ment and the ME Department are separate groups with very different tasks and histories; I do not find their example, let alone the example of another craft union entirely, instructive in resolving this dispute.

party's position ultimately should prevail—it is possible that IBEW's position has greater merit. In light of LIRR's non-frivolous arguments, however, an arbitrator is the proper entity to make a full determination on the merits, rather than this court. Not only does controlling precedent dictate this result, but so does logic. As the Second Circuit noted in *Brotherhood of Locomotive Engineers Div. 269*, 85 F.3d at 39, *Conrail* directed courts to "turn disputes such as the one presented here over to arbitrators who, as experts in the common law of the particular industry, are in a better position to interpret the provisions of the CBA than we are." (Internal citations and quotations omitted).

## Conclusion

For the reasons stated above, IBEW's motion for a preliminary injunction is DENIED. As IBEW's counsel stated on the record at oral argument that no further arguments or factual submissions were necessary for it to make its motion for a permanent injunction, IBEW's motion for a permanent injunction is also DENIED, and its complaint is DISMISSED for lack of subject matter jurisdiction.

SO ORDERED.