### In re: ORMET CORPORATION, a Delaware corporation, et al.[1] Debtors

Nos. 04–51255, 04–51256, 04–51257, 04–51258, 04–51259, 04–51260, 04–51261.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

March 24, 2005.

---

Kim Martin Lewis, Donald W Mallory, Dinsmore & Shohl LLP, Cincinnati, OH, Adam C. Harris, New York City, for debtors.

*OPINION AND ORDER ON DEBTORS' OBJECTIONS TO PROOFS OF CLAIM 1282 AND 1283 FILED BY THE UNITED STEEL WORKERS OF AMERICA, AFL–CIO–CLC*

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon the Debtors' Third Omnibus Objection to Certain Claims (the "Claim Objection"), wherein Debtor Ormet Corporation and six of its direct and indirect wholly-owned subsidiaries (collectively, the "Debtors"), objected to two proofs of claim filed by the United Steelworkers of America, AFL–CIO–CLC ("USWA"). Both parties briefed the matters and the Court heard both objections on February 23, 24 and 25, 2005.

## I. *JURISDICTION*

This Court has jurisdiction over these contested matters pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this district. These are core proceedings which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(A)and (B).

## II. *DESCRIPTION OF CLAIMS*

The two claims filed by USWA are similar, but are directed against different debtors. Specifically, claim # 1282 is against Ormet Primary Aluminum Corporation ("Primary") and claim # 1283 is against Ormet Aluminum Mill Products Corporation ("Products"). The claim against Primary is for $136,985,298 and the claim against Products is for $133,587,620. Each claim asserts liability for:

(1) unpaid vacation pay;

(2) pending grievances;

(3) post-retirement insurance benefits; and

(4) any other obligations owing under certain collective bargaining agreements in place at the time these chapter 11 cases were filed, but which have since expired.

The Debtors deny liability for any of these amounts.

## A. CLAIMS FOR UNPAID VACATION PAY

USWA asserts claims in the amount of $3.9 million against both Primary and Products for pre-petition accrued unpaid vacation pay for hourly workers represented by USWA employed at the reduction plant or rolling mill in Hannibal, Ohio. In response, the Debtors presented evidence that all such payments have been made or vacation honored in the normal course of business. No specific instances were introduced to counter that evidence.

The Court finds that no prepetition claims exist for accrued unpaid vacation for hourly workers at the reduction plant or the rolling mill. Accordingly, USWA's claims against Primary and Products for unpaid vacation pay are hereby disallowed.

## B. PENDING GRIEVANCES

USWA, as the representative of hourly employees at the reduction plant and rolling mill in Hannibal, Ohio, has asserted a claim of $4,485,298 against Primary and a claim of $1,087,620 against Products for grievances previously filed against those debtors, but still pending on January 30, 2004, when these chapter 11 cases were filed. A list of such grievances is attached to each proof of claim. In response, the Debtors have represented to the Court that, pursuant to section 5.6(a) of the Debtors' Joint Plan of Reorganization dated October 1, 2004, as amended ("Plan"), such grievances will be liquidated under the procedures set forth in the applicable collective bargaining agreements ("CBAs"). To the extent that the facts and circumstances underlying a particular grievance arose prepetition, any grievance

that results in liability on the part of the Debtors will, under applicable law, be either a priority unsecured claim, a convenience class claim in Class 3, or a general unsecured claim in Class 5 of the Plan. For purposes of making distributions under the Plan, the Debtors are obligated to establish reserves for payment of these grievance claims, in accordance with Article V of the Plan, provided however, that to the extent any such claim is determined to be an allowed priority unsecured claim or convenience claim, the reorganized Debtors will pay the cash distributions on account of such claim from borrowings under their new working capital facility.

Based upon the procedure established under the Plan and upon the disputed nature of these claims, they will be allowed only as unliquidated, disputed and contingent claims in an unspecified amount. This finding specifically excludes any claims arising from (i) USWA Local 5724 Grievance Case No. 1055 filed on or about October 7, 2002; (ii) USWA Local 5724 Grievance Case No. 1056 filed on or about October 7, 2002; and (iii) USWA Local 5760 Grievance Case No. 260 filed on or about October 10, 2002. Those grievances are dealt with under the category of post-retirement insurance benefits.

### C. ANY OTHER OBLIGATIONS OWING UNDER CBAs

USWA has also asserted against Primary and Products unliquidated claims relating to "employee deductions, unpaid holiday pay, unpaid sick leave, unreimbursed medical, drug, accident, sickness and disability expenses, unreimbursed other expenses, unpaid contributions to employee benefit funds, and all other moneys which may be due under the collective bargaining agreements, including but not limited to wages, shift differentials, premiums, leave, holidays, and SUB benefits." To the extent that any of these claims are the subject of pending grievances, they are preserved under the grievance category. The claims do not apply to any amounts arising or accruing post-petition.

The Court finds that, other than the existence of pending grievances dealt with in another category, and the post-retirement insurance benefits dealt with under that category, there was no evidence that the Debtors may have breached any obligations imposed by the CBAs to any employee represented by USWA. There also was no evidence that any employee had suffered any damage related to unpaid wages or work-related benefits due under the CBAs that were formerly in effect between USWA and Primary and Products. Accordingly, the claims in this category against both Primary and Products will be disallowed.

### D. POST–RETIREMENT INSURANCE BENEFITS

#### 1. The Claims Asserted

The largest category of claims asserted by USWA are for inappropriate modifications of insurance benefits for retired employees. The amounts at issue are $128,600,000 against Primary and $128,600,000 against Products. Those amounts assume that the benefits at issue are to be terminated; however, no terminations have been proposed. The Debtors have obtained authority by separate order to modify those retiree insurance benefits going forward pursuant to 11 U.S.C. § 1114. Any damages from those modifications will need to be claimed during the bar date period set up for such claims. To the extent claims 1282 and 1283 include damages for any future modifications, they are hereby disallowed without prejudice.

USWA also alleges that the retired hourly employees it represents have been damaged by the Debtors' prepetition unilateral modifications of health insurance

benefits in 1999 and in 2003. The Debtors argue that at all times they reserved the right to modify those benefits and were within their rights to do so.

## 2. Legal Issues

The legal issues before this Court involve the duration of any medical benefits for retired hourly employees and their surviving spouses and dependents and whether the Debtors have the right, as employers who were parties to certain now-expired CBAs, to unilaterally modify the terms of those retirees' health insurance benefits. USWA claims that any such unilateral modifications violate the parties' collective bargaining agreements. The Debtors maintain they have always retained the right to modify these plans without requiring the agreement of USWA.

There is considerable case law in this circuit on these issues. That law is well summarized in *Maurer v. Joy Technologies*, 212 F.3d 907 (6th Cir.2000). The *Maurer* court notes that "[t]he central Sixth Circuit case on CBA interpretation is *UAW v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983)," and that subsequent Sixth Circuit cases interpreting CBAs regularly quote at length the following language from *Yard–Man:*

> [W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties. Clearly the parties to a collective bargaining agreement may provide for rights which will survive termination of their collective bargaining relationship. The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement.

The enforcement and interpretation of collective bargaining agreements under § 301 [of the LMRA] is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.

Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be constructed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from the examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to af-

firmatively promote any particular policy, but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Maurer,* 212 F.3d at 914–15 (quoting *Yard–Man,* 716 F.2d at 1479–80 (citations omitted)).

■ Courts, under *Yard–Man,* can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement. *Maurer,* 212 F.3d at 915 (*citing Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 655 (6th Cir. 1996)). CBAs may contain implied terms; and, in discerning these implied terms, the parties' practice, usage, and custom can be considered. *Id.* (*citing Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989)).

■ Retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *UAW v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir.1999), *cert. denied,* 529 U.S. 1067, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000)(quoting *Yard–Man,* 716 F.2d at 1482). This is because "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard–Man,* 716 F.2d at 1482 (citations omitted). Although there is an inference that the parties to a CBA intended for retiree benefits to vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest. *BVR Liquidating,* 190 F.3d at 772 (quoting *Golden,* 73 F.3d

at 656). "If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." *Maurer,* 212 F.3d at 918.

■ If benefits are conferred through two-party collective bargaining agreements, the employer does not have unilateral control over them. *Id.* at 919. Should the Court find that the parties intended to confer vested health insurance benefits on retirees and their surviving spouses and dependents, the impact of the language in the Summary Plan Documents ("SPDs") distributed by the Debtors and, in one instance, by its predecessor, will need to be considered. Such language can be effective against retirees who retire after the reservation of rights language has been inserted into a SPD. Effectiveness requires that the language be conspicuous, that the SPD be properly distributed and that the Union fail to grieve or file suit over the reservation of rights clause. *Id.*

## 3. Facts Established at Hearing.

At the hearing on these matters, it was established that Ormet bought the reduction plant and rolling mill in 1983. The hourly workers at those facilities have been represented by USWA during all times in question.

Two collective bargaining agreements between Ormet and USWA were admitted. One, effective May 12, 2000, was for hourly workers at Primary's reduction plan in Hannibal, Ohio ("Primary CBA"). The other, effective April 6, 2001, was for hourly workers at Products' rolling mill facility in Hannibal, Ohio ("Products CBA"). The Primary CBA expired in May of 2003, but was continued by agreement of the parties until July 31, 2004. The Products CBA expired on August 31, 2004. On November 1, 2004, the Debtors obtained an order

from this Court pursuant to 11 U.S.C. § 1113 authorizing rejections of those CBAs.

There are various provisions in the CBAs relevant to these claims. For example, Article I D. of the Primary CBA provides that "any agreement applying or interpreting its terms shall be in writing and approved by Local Union and a representative of the International Union and the Manager, Industrial Relations ... in order to be valid in any future application of the terms of the Agreement." Article 40.1 of the Products CBA is a similar provision.

Article XXVII of the Primary CBA provides that "[t]he Group Insurance Plan as negotiated between the Company and the Union is hereby made a part of this Agreement by reference." Both CBAs contain Appendices of "Memorandums of Understanding, Guidelines and Letters" to remain in effect unless otherwise agreed to by the parties. These documents are expressly stated to be within the CBAs. Relevant items in Appendix D of the Primary CBA and Appendix 54 of the Products CBA include letters agreeing "to continue the joint Union–Management Committee on health care and cost containment established under the 1990 Settlement Agreement." That Joint Committee was given authority to recommend modifications to benefits provisions for more efficient utilization of health care resources. Any such recommendation requires written agreement between Ormet and USWA prior to becoming effective. The letters also provide for establishment of a joint committee to review available Medicare risk or choice arrangements in the geographic regions. The letters require that any Medicare risk or choice arrangement offered to Medicare eligible retirees or their dependents be a result of the Joint Committee's recommendation to make such an option available.

There are letters in the Appendices of both CBAs, two for the Primary CBA and one for the Products CBA, which require the Company to "maintain its program of medical benefits for retirees and surviving spouses who retired on or after January 1, 1994", with certain per capita payment "caps". These letters were known as the FASB "cap" letters and their import is disputed. A final relevant letter in Appendix D of the Primary CBA, dated April 24, 2000, states:

> Until the expiration of the current labor agreement, the company shall continue to provide reimbursements for Medicare Part B premiums for those eligible retirees, including eligible spouses and surviving spouses and/or those who are on disability and receiving social security disability benefits. However, for those who retired or became disabled, on or after June 1, 1999, the annual cost of the reimbursements paid for by the company under this program shall be limited to the Medicare Part B premium amount, as of January 1, 1999, or $45.50.

> The parties agree that the subject of the limitation set forth in this letter shall be a mandatory subject of bargaining in any negotiations between the parties occurring subsequent to May 1, 2000 and prior to December 31, 2003.

USWA argues that the letters show an intent that the retiree medical benefits vest for a period past the terms of the two CBAs and that any contribution which might be required of retirees as part of the cap in medical expenses established by the FASB letters be bargained for at any subsequent collective bargaining sessions. The Debtors dispute this interpretation of the letters and argue that they were prepared only for accounting purposes and not to show any intent by the parties to vest health insurance benefits in retirees

or to limit retiree contributions other than in the context of those letters.

Appendix 55 of the Products CBA discusses a managed care program agreed to in 1993 and protocols, criteria and standards to be implemented. That letter, updated to April 6, 2001, agrees that the managed care program will go into effect January 1, 1994 and the current Elective Benefit Plan will remain in effect until that time. It also refers to a letter in which evaluation criteria and standards are described.

Other than the CBA provisions discussed above, there is no evidence of any agreements between USWA and these debtors from which the Court could discern the intent of these parties with regard to medical benefits for retirees. There are numerous Summary Plan Description booklets issued by the company and sent to retirees who were eligible for the benefits discussed therein. The Debtors contend that the SPDs clearly evidence the intention of the parties regarding the continuation of retiree health benefits. Those SPDs were drafted by the Debtors and sent to USWA for possible comment prior to circulation. Each of them had issue dates or effective dates between January 1, 1981 and January 1, 2003, and each contained clear and explicit statements reserving to the company, as the plan sponsor, the right to modify the plans at any time. Those statements were not conspicuous, however, and were found toward the end of very lengthy documents.

There are other provisions in the SPDs, however, that are consistent with a finding that whatever health insurance benefits were conferred on retirees by the CBA in effect at the time they retired were intended to remain with them until they died. At that point, these benefits would pass on to their surviving spouses for the remainder of the spouses' lives if the retired employees had elected such coverage. *See*

Exhibit A, p. 3; Exhibit B, p. 7; Exhibit F, p. 7; and Exhibit G, p. 3.

The testimony of retired hourly workers who had retired between February 1989 and June 30, 2003, established that they met with a representative of the company one to three months prior to their anticipated retirement. At that time, it was explained to them that if they forfeited 5% of the pension they had earned, upon their death their surviving spouses would receive a pension equal to 50% of the worker's pension amount and the ability to continue to participate in the health insurance plan. Only one of the retirees, the latest to retire in June 2003, was told that the cost of the health insurance might change; none of the rest of them was told it would or would not change. All of them believed that by giving up part of their pension, their surviving spouses would always be provided a partial pension and whatever health insurance the deceased retiree would have had.

In 1999 and in 2003, the Debtors made certain changes to the health insurance available to retirees. In 1999, those changes included switching pre-Medicare retirees to a managed care program with penalties for the use of out-of-network providers and increasing co-pays and deductibles in the drug program. In 2003, changes were implemented for all retirees who retired prior to June 1, 1999. Those changes included monthly contributions from the retirees for a new drug formulary plan and cessation of the company's payment of the Medicare Part B premiums.

In the fall of 2002, after the company notified retirees of the changes to be effective in 2003, USWA filed three grievances relating to those changes. Those grievances have been denied at the initial stages and have yet to proceed to arbitration.

#### 4. Application of the Law to the Facts.

The language in the two CBAs admitted is not clear as to whether the bargaining parties intended retiree insurance benefits conferred therein or in past CBAs to continue after expiration of the CBAs. An inference that such continuance was intended would be reasonable, however. Therefore, under *Yard–Man*, the Court will look also to other documents and the bargaining history of the parties to ascertain that intent. 716 F.2d 1476, 1479–80. The Court does not accept the Debtors' contention that the unsigned SPDs are actually part of the CBAs. The language of Article I D. of the Primary CBA and Article 40.1 of the Products CBA defeat such arguments.

In considering other "evidence of the parties" intentions, the Court is especially persuaded by the undisputed evidence that neither the Debtors nor USWA believed they were bargaining for employees who were already retired. The rights and benefits for such past retirees were what those employees had bargained for under the health benefits for retirees included in the group health insurance plan in effect at the time they retired. All parties appeared to act under that expectation until the Debtors' financial problems and greater than expected health care costs caused the company recently to explicitly modify those expectations. Past retirees received their benefits as a form of delayed compensation, bargained for in previous CBAs. Therefore, such benefits were vested and the retirees must either agree or at least acquiesce prior to the imposition of any changes. The assertion of a reservation of rights clause by the Debtors, as plan sponsors, cannot change what was agreed to in a negotiated CBA. In this sense, the cases discussing such clauses, but not including the fact of a collectively bargained agreement, are not germane to the analysis.

The collective bargaining process between the Ormet companies and USWA produced negotiated contracts which set the economic and work rule requirements for hourly workers at the reduction plant and the rolling mill. Those contracts also served to determine what pension and welfare benefits active workers would have upon retirement if they retired during the effective term of the agreement. Once retired, their rights to a pension and to any additional benefits were fixed by the terms of the CBAs in effect at that time. Any terms negotiated in future CBAs would neither increase nor decrease their welfare benefits unless they consented to such changes.

Evidence established that retirees and USWA effectively acquiesced in the 1999 changes imposed by the Debtors. Those changes were seen as possibly benefiting both the retirees and the company. That is not the case for the 2003 changes, however. Even though USWA did not file grievances over the insertion of the reservation of rights clause and may not have even been aware of its insertion, it did file grievances once specific changes were proposed. Such actions should be sufficient to preserve any arguments of non-consent. Specifically, USWA filed grievances on behalf of represented employees at the reduction plant for the Debtors' cessation of reimbursement for the Medicare Part B premiums and the drug plan changes. For the rolling mill employees, the grievance was more general and objected to all modifications made in 2003 to the retiree medical benefits. Given those manifestations of objection, it cannot be said that USWA agreed to the 2003 modifications.

The Court finds that USWA's interpretation of the intention of the parties is the appropriate one. Benefits for hourly workers represented by USWA were clearly part of the process leading to the

CBAs. That process, however, focused on bargaining for hourly workers who were active employees of the debtors at the time the CBAs were executed. The retiree benefits provided for by these CBAs looked to the future when these active employees would retire. Such benefits were part of the total compensation package USWA negotiated on their behalf. CBAs entered into subsequent to an employee's retirement neither added to nor subtracted from any benefit negotiated for that employee prior to the effective date. Because the retiree health benefits were treated as "status benefits", they were not intended to change and were intended to vest for the life of the employee, and for his or her surviving spouse if such an election were purchased. Accordingly, the Debtors were not free to modify those benefits for past retirees without their consent.

### III. CONCLUSION

Based on the foregoing, the Debtors' objections to claims 1282 and 1283 filed by USWA are SUSTAINED as to unpaid vacation pay and any obligations arising under the collective bargaining agreements in effect when these chapter 11 cases were filed except for post-retirement insurance benefits and other pending grievances. The portions of claims 1282 and 1283 relating to pending grievances, other than those involving post-retirement insurance benefits, shall be liquidated in accordance with applicable collective bargaining agreements and the Debtors' confirmed Plan. The portions of claims 1282 and 1283 relating to reimbursement of the Medicare Part B premiums and other modifications imposed in 2003 are **ALLOWED**, subject to any applicable limitations set forth in the CBAs. USWA must amend its claims with-

in twenty (20) days, to specifically quantify the amounts asserted under this ruling.

**IT IS SO ORDERED.**

---

1. The Debtors are the following entities: Ormet Corporation, Ormet Primary Aluminum Corporation, Ormet Aluminum Mill Products Corporation, Specialty Blanks Holdings Corporation, Specialty Blanks, Inc., Formcast Development Inc. and Ormet Railroad Corporation.